959 So.2d 427 (2007)
Deontae THOMAS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-3181.
District Court of Appeal of Florida, Second District.
June 27, 2007.
James Marion Moorman, Public Defender, and Terrence E. Kehoe, Special Assistant Public Defender, Bartow, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Elba Caridad Martin, Assistant Attorney General, Tampa, for Appellee.
NORTHCUTT, Judge.
Deontae Thomas was convicted of first-degree murder and sentenced to life in prison. In this appeal, he argues that his trial was tainted by improper collateral crime evidence that became a feature of the trial. We agree and reverse.
In broad terms, the evidence at trial revealed the following. In June 2002, Thomas stole $95,000 from Bernard Johnson, a drug dealer in St. Petersburg. It was an inside job planned with one of Johnson's girlfriends. The girlfriend did not receive her share, however, and she advised Johnson that Thomas was the culprit. As might be expected, Johnson refrained from calling the police, opting instead to put out a $25,000 hit on Thomas. Thomas had to start dodging Johnson's associates. In September, Thomas was jailed for about six months on unrelated charges. Upon his return to the community toward the end of February 2003, he had several run-ins with people trying to collect on the bounty. Ultimately, in the early evening of April 23, 2003, Thomas and Johnson encountered each other while driving, and Thomas shot Johnson through the head with an assault rifle.
In opening statements and testimony at trial, Thomas acknowledged that he shot and killed Johnson but he asserted that he acted in self-defense. He also maintained that the shooting was not premeditated. Thus, the only contested issue for the jury was whether Thomas killed Johnson with premeditation, making him guilty of first-degree murder; with a depraved mind *428 such that he committed second-degree murder; by an act of culpable negligence sufficient to support a conviction for manslaughter; or in self-defense, in which case the homicide was legally justified.
The evidence might have supported any of those possible verdicts. Two witnesses testified that Thomas had threatened to kill Johnson, but both witnesses were connected to Johnsonhis mother and Jimmy Lee Matthews, one of Johnson's "homeboys." Matthews also testified that he had seen Thomas with assault rifles and that Thomas admitted killing Johnson afterward. Thomas's girlfriend at the time of the shooting testified that he admitted the killing to her after the fact. And the State introduced a letter from Thomas to a fellow inmate; in the letter, Thomas wrote about the price Johnson had put on his head and about the people who had tried to collect it, and then he wrote: "So kill the head and the body dead. It was either me or him."
In his trial testimony, Thomas recounted that he was alone on the evening in question. He had borrowed a friend's truck and was getting gas when he was approached by Kenneth Davis, a Johnson associate who went by the street name Trouble D. Thomas thought it suspicious that Davis was wearing a hooded sweatshirt, because the weather was warm. Davis said, "I need to talk to you about my homeboy money." Thomas then spied Johnson sitting in the driver's seat of an SUV parked nearby. According to Thomas, Davis was known for using guns, and he saw Davis reach into the passenger compartment of Johnson's car. Thomas sped off in the truck, attempting to evade them. But when he turned a corner, he found his truck nose-to-nose with Johnson's vehicle. Thomas testified that Davis was standing outside the vehicle and held his firearm over the roof. Thomas grabbed a weapon that his friend had left in the truck, and he shot twice. One shot hit Johnson's car and the other struck Johnson in the head.
According to the medical examiner, Johnson died almost instantly. His foot must have fallen against the gas pedal because the SUV lurched forward, ran over a stop sign, and crashed into the front bedroom of a nearby house. Two eyewitnesses who testified for the State offered differing versions of the shooting, but neither of them had seen Davis. The defense also called two eyewitnesses, but they had not seen Davis, either.
The specific controversy that concerns us today centers on matters that transpired after Johnson was killed. Over the following two days, Thomas allegedly participated in several drive-by shootings directed at Johnson's associates. Tipped by an informant, the police were looking for him. They apprehended him on April 25, 2003, after officers witnessed shots fired by the occupants of a Chevrolet Impala at the driver of a passing Pontiac Sunbird. A stray bullet struck and killed a bystander. The shooters' car then led the police on a chase. During the pursuit, two men hung out the back seat windows of the fleeing car and fired assault weapons. One officer suffered a gunshot wound to the head. The chase ended when the officers rammed the suspects' vehicle with a police car. Five men, including Thomas, were then recovered from the car. Thomas was pulled from the back seat, and the weapon that had killed Johnson was recovered from the highway. For the events following Johnson's death, Thomas was charged with first-degree murder of the bystander, three counts of attempted first-degree murder, ten counts of attempted second-degree murder, and possession of marijuana. Three co-defendants were also charged.
*429 The State attempted to have all the charges consolidated for trial, but its efforts failed. In this case, then, Thomas was tried alone and only for Johnson's murder. Prior to trial, the State filed a notice of intent to use evidence of other bad acts and of facts and circumstances that it claimed were inextricably intertwined with the Johnson homicide, starting with the theft of Johnson's money and ending with the police chase that culminated in Thomas's arrest. Thomas moved to prevent the State from using any evidence of events occurring after Johnson's death. The defense later conceded that the State could properly introduce evidence concerning the theft of Johnson's money and limited evidence regarding Thomas's pursuit and apprehension.
The trial court entered an order granting Thomas's motion in part "in that the State shall not introduce evidence of any collateral crimes except for the burglary, the police chase (and accompanying attempted murder of law enforcement officer charge) and the possession of the murder weapon." The court reasoned that evidence of the police chase and attendant shoot-out "would tend to demonstrate that [Thomas] was in possession of the murder weapon and he was using it in a manner displaying intent to harm or kill." The court ruled that this evidence was relevant because it bore on Thomas's intent, identity, or knowledge; it placed the Johnson homicide weapon in Thomas's hands; and it allowed the State to paint a "complete picture" regarding Thomas's "possession and willingness to use the murder weapon." But the court ordered the redaction of portions of Thomas's letter to his jail mate. And it warned that the State was not to make evidence of the events following Johnson's death a feature of the trial or introduce it solely for the purpose of showing bad character or propensity.
At trial, however, the court allowed the State to do just that. Beginning with the prosecutor's opening statementin which the jury was told that the police pursuit began when one detective saw "what is shocking to even an experienced officer" and continuing in its case-in-chief, the State was permitted to explore the April 25 chase and the gunfire that commenced it in inordinate detail. For example, the driver of the Sunbird that was fired upon testified that he had done nothing to provoke the gunfire. A police detective who witnessed the shooting described the incident blow by blow. The State was permitted to document the shooting with photographs of bullet damage to the Sunbird and an aerial photograph of the scene. It introduced physical evidence as well: spent shell casings found at the scene and a bullet fragment taken from the Sunbird.
Another officer gave a running account of the ensuing chase. Employing a map, he described the pursuit at length and in harrowing detail. The officer recounted the various dangers he and the suspects encountered when careening through city streets, driving onto the Interstate highway and off again, speeding through intersections, and running red lights. He testified that when the suspects' car went onto the Interstate, two of the suspects hung out its windows and opened fire on his police cruiser, blowing out his spotlight. The suspects shot through the officer's windshield, hitting him in the head, but the officer continued the pursuit. More shots were fired before two weapons were thrown from the car. The officer described how he ended the pursuit by ramming his cruiser into the suspects' car, causing it to crash and roll over. In addition to the officer's testimony, the State introduced photographs of the damage to the police cruiser, of the officer's head injury, and of the suspects' car as it lay upside down after the crash. The State *430 even was allowed to introduce the baseball cap that the officer was wearing when he was shot, replete with bullet hole. The trial court did exclude a twenty-minute video reenacting the pursuit route.
The State correctly recognizes that none of this collateral crime evidence was admissible under the Williams rule, codified at section 90.404(2)(a), Florida Statutes (2004), because it was not similar fact evidence. See Henry v. State, 574 So.2d 73, 75 (Fla.1991) (holding that evidence regarding defendant's murder of his step-son was not properly admitted as Williams rule evidence in trial for murder of boy's mother because the two crimes were not similar). But the State argues on appeal, as it did below, that the evidence was admissible because the events that it depicted were inextricably intertwined with the crime charged. Under this theory, evidence of collateral acts is admissible when "it is a relevant and inseparable part of the act which is in issue. . . . [I]t is necessary to admit the evidence to adequately describe the deed." Griffin v. State, 639 So.2d 966, 968 (Fla. 1994) (quoting Charles W. Ehrhardt, Florida Evidence § 404.17 (1993 ed.)) (alteration in original).
Most of the evidence at issue here did not meet this test. Some of it may have been admissible to explain Thomas's apprehension and to place the murder weapon in his possession. Beyond that, however, it simply was not necessary to admit this evidence to "adequately describe the deed" for which Thomas was being tried. The events of April 25 had no bearing on the only contested issue before the jury, that being Thomas's mental state during his encounter with Johnson two days earlier.
But even if it could be concluded that the events of April 25 were more than minimally relevant, there was no justification for the volume of detailed evidence that was tendered to prove them. The State proceeded almost as if it had been successful in its attempt to consolidate the various charges against Thomas for trial. As such, the collateral crime evidence improperly emphasized the events of April 25 to the point that they became a feature of Thomas's trial. See Steverson v. State, 695 So.2d 687 (Fla.1997) (reversing when evidence with a limited relevance was so extensive that it became a feature of trial, distracting the jury from the case at hand).
It was a highly prejudicial feature at that. The extensive collateral crime evidence portrayed Thomas as a man with a propensity for unbridled violent lawlessness who, without regard for the safety of the public at large, had engaged in conduct that, in the words of the prosecutor, was "shocking to even an experienced officer." The prejudice flowing from this evidence substantially outweighed any slight probative value it may have had, thus calling for its exclusion. See § 90.403; Henry, 574 So.2d at 75. Because there was evidence that would have supported a verdict for a lesser degree of homicide, or even arguably an acquittal based on self-defense, the State cannot demonstrate that the erroneous admission of this evidence was harmless. See Henry, 574 So.2d at 75. Accordingly, we reverse and remand for a new trial.
Reversed and remanded for new trial.
CASANUEVA and CANADY, JJ., Concur.