*283
 
 PER CURIAM.
 

 Tavares Jerrod Wright appeals his judgments of conviction and his sentences of death for the first-degree murders of David Green and James Felker, and his concurrent sentences for one count of carjacking with a firearm, two counts of armed kidnapping with a firearm, and two counts of robbery with a firearm. We have mandatory jurisdiction to review final judgments arising from capital proceedings, and we affirm Wright’s convictions and sentences.
 
 See
 
 art. V, § 3(b)(1), Fla. Const.
 

 We conclude that the trial court did not abuse its discretion in admitting evidence of inextricably intertwined collateral crimes. Additionally, we conclude that Wright knowingly waived his right to a penalty-phase jury, and thus has also waived his
 
 Ring
 

 [1]
 

 challenge. Finally, we conclude that there is competent, substantial evidence which supports the judgments and sentences entered by the trial court.
 

 FACTS AND PROCEDURAL HISTORY
 

 With the aid of codefendant Samuel Pitts, Wright carjacked, kidnapped, robbed, and murdered David Green and James Felker while engaged in a three-day crime spree that spanned several areas in Central Florida.
 
 [2]
 
 During the crime spree, Wright was connected multiple times to a stolen pistol that matched the caliber of casings discovered at the scene of the murders. The trial court allowed the State to present evidence of these collateral acts to demonstrate the context in which the murders occurred and to explain Wright’s possession of the murder weapon.
 

 The spree began when Wright stole a pistol and a shotgun from the Shank family’s residence in Lakeland on Thursday, April 20, 2000. On the Friday morning following the burglary, Wright used the pistol to commit a drive-by shooting in a neighborhood near the Shank residence.
 
 [3]
 
 That evening, Wright and Samuel Pitts abducted Green and Felker in Lakeland, drove Green’s vehicle approximately fifteen miles to Polk City, and murdered the victims in a remote orange grove. Wright shot one victim with a shotgun, which was never recovered, and the other victim with a pistol that used the same caliber bullets as the gun stolen from the Shank residence. Wright then abandoned the victim’s vehicle in a different orange grove in Auburndale. In nearby Winter Haven, Wright used the Shank pistol in a carjacking that occurred during the morning hours on Saturday, April 21, 2000. That afternoon, law enforcement responded to a Lakeland apartment complex based on reports of a man matching Wright’s description brandishing a firearm.
 

 When an officer approached, Wright fled, but he was eventually arrested in the neighboring mobile home park. Ammunition matching the characteristics of the ammunition stolen from the Shank residence was found in his pocket. The stolen pistol was also recovered near the location where Wright was arrested. Almost a week later, the bodies of the victims were discovered. Thus, the following facts are presented in chronological order to demonstrate the geographical nexus of the of
 
 *284
 
 fenses and to provide a complete picture of the interwoven events surrounding the double murders.
 

 The Crime Spree
 

 The Shank Burglary: Thursday, April 20, 2000
 

 On Thursday, April 20, 2000, Wright unlawfully entered a Lakeland home with two accomplices. Wright testified that they separated to search the house for items to steal. In one bedroom, Wright found and handled a plastic bank filled with money. One of his accomplices discovered a 12-gauge, bolt-action Mossberg shotgun and a loaded Bryco Arms .380 semi-automatic pistol with a nine-round clip in another bedroom.
 
 [4]
 
 The accomplice also found four shells for the shotgun in a dresser drawer. In exchange for marijuana, Wright obtained possession of the pistol from the accomplice.
 

 When Mark Shank returned home after work to discover his firearms missing, he notified the Polk County Sheriffs Office of the burglary. The Sheriffs Office lifted latent prints from the house, including several from the plastic bank. An identification technician with the Sheriffs Office matched the latent palm print lifted from the plastic bank to Wright’s palm print, confirming that Wright was inside the house where the Shank firearms were stolen. The following day, Wright used the stolen pistol during a drive-by shooting in a nearby Lakeland neighborhood.
 

 The Longfellow Boulevard Drive-By Shooting: Friday, April 21, 2000
 

 At approximately 9 a.m. on Friday, April 21, 2000, Carlos Coney and Bennie Joiner observed a black Toyota Corolla approaching slowly on Longfellow Boulevard as they were standing outside a nearby house. Wright and Coney had been embroiled in a continuing dispute since their high school days. Joiner made eye contact with Wright, who was sitting on the passenger side. The car made a U-turn and slowly approached the house again. Wright leaned out the passenger side window and fired multiple shots. One bullet struck Coney in his right leg. Coney’s neighbor carried the wounded man to a car and drove Coney and Joiner to a Lakeland hospital where a .380 caliber projectile was removed from Coney’s leg.
 

 While Coney was being treated at the hospital, crime-scene technicians collected cartridge casings and projectiles from the Longfellow Boulevard scene. Two projectiles had entered the house and lodged in the living room wall and table. One spent .25 caliber casing and three spent Winchester .380 caliber casings were recovered from the driveway and the street. The projectile recovered from Coney’s leg and the one removed from the living room table were fired from the .380 pistol stolen from the Shank residence.
 
 [5]
 
 The recovered casings definitely had been
 
 loaded
 
 in the stolen pistol, but the firearms analyst could not state with precision that they had been
 
 fired
 
 from the pistol because the casings lacked the necessary identifying characteristics.
 

 Approximately one hour after the drive-by shooting, Wright unexpectedly visited James Hogan at a house in Lake Alfred,
 
 *285
 
 Florida. Lake Alfred is approximately fourteen miles away from the Longfellow Boulevard location. Wright testified that he and an accomplice from the Shank burglary and Samuel Pitts traveled to see Hogan because the accomplice wanted to sell the stolen shotgun. When they arrived, the accomplice attempted to show Hogan the shotgun, but Hogan was not interested. At that point, Wright pulled a small pistol from under the floor mat in the front seat of the vehicle. This placed Wright in possession of the possible murder weapon on the day of the murders.
 

 The Double Murders in the Orange Grove: Friday, April 21, 2000
 

 The trio remained with Hogan for approximately twenty minutes and then left together to return to the Providence Reserve Apartments on the north side of Lakeland. Wright and Samuel Pitts lived at that apartment complex with Pitts’ family and girlfriend, Latasha Jackson. To support his theory of defense that he did not possess the pistol during the time the murders likely occurred, Wright testified that following the drive-by shooting, he informed Samuel Pitts of the details of the shooting. Wright explained that he had an obligation to disclose his actions to Pitts, who was the leader of a gang of which Wright was a member. According to Wright, the drive-by shooting upset Pitts, and Pitts demanded that Wright surrender the pistol. Wright asserted that he complied with Pitts’ demand.
 

 According to Wright’s testimony, around twilight that Friday evening, a customer messaged Wright to inquire about procuring marijuana. Wright agreed to meet the customer at a supermarket parking lot and started walking toward the store. Shortly after 7:15 that evening, a female friend saw Wright walking down the street and offered him a ride, which Wright accepted. Then, without provocation, Wright said, “I ain’t even going to lie, I did shoot the boy in the leg yesterday,” more' likely than not referring to the Longfellow Boulevard drive-by shooting. When they arrived at the store, Wright exited the vehicle in the supermarket parking lot without further elaboration of the statement.
 

 Some time that night, James Felker and his cousin, David Green, were abducted from that parking lot and murdered. The cousins left Felker’s house at approximately 8 p.m. in Green’s white Chrysler Cirrus for a night of bowling. Both men were carrying at least $100 at that time.
 

 Several witnesses testified that Wright had willingly described the details of the abduction. Wright had informed the witnesses that he approached Felker and Green in the supermarket parking lot and requested a cigarette. When they refused, Wright pulled out a pistol and forced his way into the backseat of Green’s vehicle. Wright then ordered Green to drive to the Providence Reserve Apartments, where Pitts entered the vehicle.
 

 As this group left the apartments between 10 and 10:45 p.m., Wright ran a stop sign in the victim’s car. A detective observed the traffic infraction and conducted a tag check as he followed the vehicle. The tag check reported that the license plate was registered to an unassigned Virginia plate for a blue, 1988, two-door Mercury, which did not match the vehicle to which it was attached.
 

 After receiving this report, the detective activated his emergency lights and attempted to stop the white Chrysler. The Chrysler sped through another stop sign and accelerated to sixty miles per hour. The detective remained in pursuit for ten to fifteen minutes before his supervisor ordered the pursuit terminated. An all-county alert was issued to law enforcement to be on the lookout for the Chrysler. The identification developed from the pursuit
 
 *286
 
 connected Wright to the victim’s vehicle on the night of the murders.
 

 R.R., a juvenile who also lived at the Providence Reserve Apartments, testified that Wright informed him that Wright and Pitts drove the victims ten miles from the abduction site to a remote orange grove in Polk City. When the victims insisted that they had nothing to give the assailants, Wright exited the ear. One of the victims also exited, possibly by force, and Wright shot him. The other victim then exited, and Wright shot him as well. While one of the men continued to crawl and moan, Pitts retrieved the shotgun from the trunk and handed it to Wright, who then shot this victim in the head execution-style. Wright and Pitts abandoned the bodies and drove away in the Chrysler.
 
 [6]
 

 Sometime between 10 p.m. and midnight, Pitts and Wright drove the Chrysler to a Lakeland apartment complex to wash blood spatter off the vehicle. When they arrived at the apartment, Pitts ordered Wright to wash the car while Pitts removed items from the vehicle, including a phone, a black bag, and a Polaroid camera. Pitts placed the items in his sister’s vehicle. She had arrived with R.R., who testified that when they arrived, Pitts and Wright were acting nervous and scared. On the ride back to the apartment complex, Pitts told R.R. “that they pulled off a lick and that things was getting crazy.”
 

 Wright testified that before Pitts left, he ordered Wright to burn the car and throw the weapon into a lake. Instead, Wright kept the pistol and later drove back to Hogan’s house in Lake Alfred. Hogan suggested that Wright dump the car in an Auburndale orange grove, and Wright followed that suggestion.
 

 The Winter Haven Carjacking: Saturday, April 22, 2000
 

 In the vicinity of the Auburndale orange grove where the homicide victim’s vehicle was abandoned, Ernesto Mendoza and Adam Granados were addressing a car battery problem in the parking lot of a fast-food restaurant. It was during those early morning hours of Saturday, April 21, that Wright allegedly approached them, pointed a small handgun at a female with them, and announced that he was going to take the car.
 
 [7]
 
 Wright immediately entered Mendoza’s vehicle and sped away. Granados and Mendoza quickly entered a truck and pursued Wright. The car chase continued through several streets before Wright ran the vehicle onto the curb near a car dealership in Lake Alfred. Wright exited the vehicle, fired several gunshots at Granados and Mendoza, and then escaped across the car lot in the direction of James Hogan’s house.
 

 Several .380 caliber casings were also collected from this scene. These casings were later identified as having been fired from the pistol stolen from the Shank residence. One latent print was lifted from the interior side of the driver’s window of Mendoza’s car, and three were lifted from the steering wheel. All of these latent
 
 *287
 
 prints matched Wright’s known fingerprints.
 

 Hogan, whose house was within walking distance of the car dealership from which Wright was seen fleeing, testified that when he returned home at approximately 12:30 a.m. on Saturday, he found Wright seated there. Wright asked Hogan to drive him back to the Providence Reserve Apartments, and on the way there, Wright spontaneously said “they had shot these two boys,” and that he had also “got into it with some Mexicans.” Wright confessed to Hogan that they had transported two white men to an orange grove and shot both men with a pistol and a shotgun. Wright also confirmed that they engaged in a high-speed chase with police in Lake-land. However, at that point, Wright did not disclose the identity of the other person who aided in the murders.
 

 The Providence Reserve Foot Chase and Subsequent Investigation: Saturday, April 22, 2000
 

 After Hogan returned Wright to the apartment complex following the Winter Haven carjacking, Wright was observed throughout Saturday handling a pistol at the Providence Reserve Apartments. He also spoke with people regarding the murders. Wright confessed to R.R. that he received a cellular phone from a “lick,” meaning it had been stolen. He also described to R.R. the details of the abduction and murders. Wright then gave the stolen phone to R.R.
 

 Later that day, Wright was seated with Latasha Jackson on the steps of the apartment building, and Wright had a small firearm resting in his lap. During their conversation, Wright told Jackson that he shot two white men in an orange grove and that he had shot one in the head. Soon after this, the police responded to a report of an armed man, who matched Wright’s description, at that location.
 
 [8]
 

 A uniformed officer approached Wright and Jackson and stated that he needed to speak with Wright. Wright jumped over the balcony railing and raced down the stairs. As Wright ran from the apartment, his tennis shoes fell off. Jackson picked up the shoes and placed them by the apartment door. The police later seized these sneakers from the apartment during the murder investigation. James Felker’s DNA was determined to match a blood sample secured from the left sneaker. Though Wright contended that the shoes were not his and that he had never worn them, both Wright and Pitts were required to try on the shoes. The shoes were determined to be a better fit for Wright than for Pitts.
 

 Several officers chased Wright from the Providence Reserve Apartments to a nearby mobile home park, which was located across a field from the apartment complex. During the chase, the officers noticed Wright holding his pants pocket as if he carried something inside. Wright was arrested at the mobile home park, and his pocket contained live rounds and a box of ammunition containing both .880 Federal and Winchester caliber of rounds. This was the same caliber ammunition as that recovered from the drive-by shooting, the murders, and the carjacking.
 

 After the police departed, a resident of that mobile home park entered her car to leave for dinner. Her vehicle had been parked there with the windows down when Wright had been arrested near her front door. As she entered her vehicle, she discovered a pistol, which was not hers. This weapon was determined to be the pistol stolen from the Shank residence.
 

 
 *288
 
 Wright was taken into custody pending resolution of the aggravated assault charges. While Wright was in custody, Auburndale police officers discovered David Green’s white Chrysler abandoned in an orange grove. Crime-scene technicians discovered blood on both the exterior of the vehicle and on the interior left side. Four of the blood samples from the vehicle matched James Felker’s DNA profile. Further investigation revealed that prints lifted from multiple locations on the vehicle matched known prints of Wright.
 
 [9]
 

 A deputy with the Polk County Sheriffs Office linked this abandoned vehicle with a missing persons report for David Green and James Felker. After the vehicle was discovered, the family of the victims gathered at the orange grove to search for any items that might aid in the missing persons investigations. Green had his personal Nextel cellular phone and a soft black bag filled with special computer tools that he utilized for his work in the Chrysler. A Polaroid camera had also been left in Green’s vehicle. Green’s fiancée discovered her son’s jacket in that grove, but Green’s workbag, tools, cellular phone, and camera were, all missing from the vehicle.
 

 A couple of days after the murders, Pitts attempted to sell the black bag that contained Green’s computer tools to a pawnshop. R.R. assisted his stepfather in securing proceeds for the Polaroid camera from another pawnshop. The police had begun contacting pawnshops looking for the items missing from Green’s car and recovered the black computer bag and the pawn tickets, which led them to Pitts and R.R.
 
 [10]
 
 Further investigation established that three latent fingerprints from the black bag matched Wright’s known fingerprints.
 

 Following the information obtained from the pawnshop, the police traveled to R.R.’s residence where they identified and seized the Nextel cellular phone Wright had given R.R. The phone seized from R.R.’s residence matched the serial number of David Green’s phone. R.R. told the police that Wright, who was still in jail on the aggravated assault arrest, had given him the phone.
 

 A few hours later, a detective questioned Pitts, who revealed the general location of the bodies. Six days following the disappearance of David Green and James Felker, their bodies were discovered in a remote orange grove in Polk City. Each man had been shot three times, and spent bullet cases surrounded the bodies. David Green was face-up, with bullet wounds in his chest and in his head. From his outstretched hand, the police recovered a wallet that contained Green’s license. James Felker was face-down in the same area, with three bullet wounds in his head. Green’s cause of death was determined to be multiple gunshot wounds to the chest, the forehead, and the back of his neck. A medical examiner removed a projectile from Green’s face and a deformed projectile from his throat. Felker’s cause of death was determined to be gunshot wounds to the head, one by a .380 caliber projectile to the forehead and two by a shotgun blast to the back of the head. Except for the gunshot wound to Green’s chest, any of the gunshot wounds would have rendered the victims unconscious instantaneously.
 

 
 *289
 
 Law enforcement never recovered the shotgun used in these murders. However, a Florida Department of Law Enforcement firearms expert inspected the pistol recovered from the mobile home park, which was identified as the pistol stolen from the Shank residence, and the firearms-related evidence collected from the various crime scenes. The expended projectiles from the pistol and those found in Wright’s possession were of the same caliber but were different brands. Due to the damage sustained by some of the projectiles, the expert was unable to conclusively establish that the pistol stolen from the Shank residence fired all .380 caliber bullets discovered at the scene of the murders. However, the projectiles and the firearm were of the same caliber and displayed similar class characteristics. Five Federal .380 caliber casings discovered near the victims were positively identified as having been fired from the pistol. Thus, the stolen Shank pistol had likely been used in, and connected with, the Longfellow Boulevard drive-by shooting, the double murders of David Green and James Felker, and the Winter Haven carjacking.
 

 The Trial
 

 On October 18, 2004, Wright began his third trial on these charges.
 
 [11]
 
 The jury returned a guilty verdict on all seven counts and made specific findings that Wright used, possessed, and discharged a firearm, which resulted in death to another. Wright waived his right to have a penalty-phase jury. The jury was discharged after the trial court conducted a thorough colloquy and determined that the waiver was made knowingly, intelligently, and voluntarily.
 

 During the combined penalty-phase and Spencer
 
 [12]
 
 hearing, the State presented impact statements from the victims’ families. The State introduced the certified judgments and sentences from the Longfellow Boulevard drive-by shooting and from two incidents that occurred while Wright was imprisoned prior to the capital trial.
 
 [13]
 
 The State also presented the testimony of the victims of the jail-related felonies. Defense counsel stipulated that the contemporaneous capital convictions supported the aggravating circumstance of a prior violent felony.
 

 The defense presented mitigation evidence of Wright’s traumatic childhood through the testimony of his family, which included virtual abandonment and neglect by his parents. Two defense expert witnesses testified that Wright’s exposure to cocaine and alcohol in útero caused some microcephaly, which is a condition that affects the size of the brain, and mild traumatic injury to Wright’s brain. Though one defense expert determined that Wright has borderline intellectual functioning, including impairments in his frontal lobe functioning for reasoning and judgment, the expert testified that Wright
 
 *290
 
 did not satisfy the requirements for statutory mitigation
 
 [14]
 
 or qualify as mentally retarded under section 921.137, Florida Statutes (2000).
 
 [15]
 

 To the contrary, the other defense expert testified that Wright was of low intelligence, which approached that of mental retardation due to fetal alcohol syndrome. In that expert’s opinion, Wright could not balance a checkbook, maintain a household, or keep his refrigerator stocked. However, this expert did not consider the recognized standardized intelligence tests required by section 921.137 to be the measure of mental retardation and conceded that under the statutory definition, Wright would not be considered mentally retarded.
 

 A special hearing was held to specifically address whether Wright met the statutory criteria for mental retardation. Wright’s scores from each doctor’s evaluation fell within the borderline range, but did not drop below 70. Thus, the trial court found that under the statutory requirements, Wright was
 
 not
 
 mentally retarded. The court noted that there was evidence to the contrary, but held that such evidence did not fall within the purview of the applicable statute.
 

 Following this hearing, the trial court found four aggravating circumstances, three statutory mitigating circumstances, and several nonstatutory mitigating circumstances.
 
 [16]
 
 The trial court concluded
 
 *291
 
 that the aggravating circumstances far outweighed the mitigation and that, even in the absence of any individual aggravating circumstance, the trial court would still find that the aggregate of the remaining aggravating circumstances outweighed all existing statutory and nonstatutory mitigating circumstances. Thus, the court imposed a death sentence for each count of first-degree murder and life sentences for each of the five noncapital felonies, all to run consecutively.
 

 ANALYSIS
 

 In this direct appeal, Wright challenges one aspect of the guilt phase and three aspects of the penalty phase, as follows: (1) whether the trial court erred in admitting collateral-crime evidence as inextricably intertwined with the offenses on trial, which Wright contends became a feature of the trial that rendered the probative value of this evidence to be substantially outweighed by its prejudicial effect; (2) whether the trial court erred in denying Wright’s motions to declare Florida’s capital-sentencing scheme unconstitutional pursuit to
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (3) whether the trial court erred in finding that the murders were committed in a cold, calculated, and premeditated manner; and (4) whether the trial court erred in finding that the dominant purpose for committing the murders was witness elimination to avoid arrest. We conclude that Wright has not demonstrated a basis for relief on any of these issues and that sufficient evidence supported each of the death sentences, which we further hold are proportionate punishments for Wright’s capital convictions.
 

 The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of the Inextricably Intertwined Collateral Crimes
 

 Wright first asserts that the trial court abused its discretion when it denied his motion in limine to exclude collateral-crime evidence because the admission of this mass of evidence, which possessed an inflammatory nature, became a feature of the trial and caused the prejudicial effect of such evidence to substantially outweigh any probative value. After a hearing prior to the first trial, the trial court ruled that all of the collateral-crime evidence was admissible. During the third trial, the trial court adopted this prior ruling, but limited the evidence to instances where the collateral-crime evidence was admitted in the previous trials as inextricably intertwined with the crimes charged.
 

 Evidence of Collateral Crimes Must Be Relevant
 

 A trial court has broad discretion to determine the relevancy of evidence. Thus, we will not disturb a trial court’s decision to admit inextricably intertwined evidence absent an abuse of discretion.
 
 See Sexton v. State,
 
 697 So.2d 833, 837 (Fla.1997) (citing
 
 Heath v. State,
 
 648 So.2d 660, 664 (Fla.1994)). The trial court’s discretion is limited, however, by the evidence code.
 
 See McDuffie v. State,
 
 970 So.2d 312, 326 (Fla.2007);
 
 see also
 
 ch. 90, Fla. Stat. (2000).
 

 The prerequisite to the admissibility of evidence is relevancy. All evidence tending to prove or disprove a material fact is admissible, unless precluded by law.
 
 See
 
 §§ 90.401-90.402, Fla. Stat. (2000). Relevant evidence “is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” § 90.403, Fla. Stat. (2000). Therefore, collateral-crime evidence, such as bad acts not included in the charged offenses, is admissible when relevant to prove a
 
 material
 
 fact in issue, but is inadmissible when
 
 *292
 
 the evidence is relevant
 
 solely
 
 to prove bad character or propensity.
 
 See
 
 § 90.404(2)(a), Fla. Stat. (2000). The trial court correctly discerned that the admission of collateral-crime evidence as inextricably intertwined with the charged offenses is not considered Williams
 
 [17]
 
 rule evidence, which is a special application of the general relevancy rule for collateral crime.
 
 See Taylor v. State,
 
 855 So.2d 1, 21 (Fla.2003).
 

 Occasionally when proving the elements of a crime, it becomes necessary to admit evidence of other bad conduct to adequately describe the offense or connect the elements of the offense because the charged offense and the other conduct are significantly linked in time and circumstance.
 
 See Griffin v. State,
 
 639 So.2d 966, 968 (Fla.1994). In other words, this evidence is admissible because it is a
 
 relevant
 
 and
 
 interwoven
 
 part of the conduct that is at issue. Where it is impossible to give a complete or intelligent account of the criminal episode without reference to other uncharged crimes or bad conduct, such evidence may be used to cast light on the primary crime or elements of the crime at issue.
 
 See Zack v. State,
 
 753 So.2d 9, 17 (Fla.2000) (evidence of dissimilar robberies during weeklong crime spree admissible to “piece together the sequence of events leading up to this murder” and to place the “present case in perspective”). However, when there is a “clear break between the prior conduct and the charged conduct or it is not necessary to describe the charged conduct by describing the pri- or conduct, evidence of the prior conduct is not admissible on this theory.” Charles W. Ehrhardt,
 
 Florida Evidence
 
 § 404.17, at 237 (2005 ed.).
 

 Wright concedes that this collateral-crime evidence provided relevant evidence to the jury and instead focuses on the cumulative, prejudicial effect generated by the admission of this evidence. We conclude that the trial court did not abuse its discretion in admitting the inextricably intertwined collateral-crime evidence as relevant because it served several purposes: (1) linked Wright to one of the murder weapons and explained his possession of this weapon; (2) provided a geographical nexus for each event; and (3) established the context of Wright’s three-day crime spree.
 

 More specifically, the Shank burglary provided evidence to the jury of when and where the pistol was stolen, provided an explanation for the origin of the unrecov-ered shotgun, and linked Wright to the pistol. The Longfellow Boulevard drive-by shooting provided eyewitness testimony and ballistics to place the pistol stolen from the Shank residence in Wright’s possession the morning before the murder. The high-speed car chase with the detective in Lakeland placed Wright in the victim’s car at the Providence Reserve Apartment complex. This evidence corroborated R.R.’s testimony that Wright carjacked the murder victims and then traveled to the apartment complex. The detective’s pursuit was also the first law enforcement contact with the victim’s vehicle. Green and Felker had not been reported missing at this time. When the abandoned white Chrysler was recovered on April 22, a sheriffs lieutenant realized that it was probably the same vehicle from the Lakeland car chase, thus linking the vehicle recovered in a remote grove with the area of the Providence Reserve Apartment complex.
 

 Further, the carjacking at 1 a.m. on Saturday, April 22, 2000, placed Wright within a few miles of the orange groves
 
 *293
 
 where the murders occurred and the vehicle was abandoned. It also provided ballistics and eyewitness testimony regarding Wright’s possession of the murder weapon immediately following the murders. The Providence Road foot chase explained Wright’s arrest and the discovery of the murder weapon. In that instance, the trial court attempted to limit introduction of evidence that the officers responded to the apartments because of a report of an aggravated assault, for which Wright was charged but was acquitted. Thus, there was no abuse of discretion in admitting this evidence for these limited purposes.
 

 Feature of the Trial
 

 Wright urges this Court to hold that the trial court abused its discretion by allowing the collateral evidence to become a feature of the trial or by allowing the prejudicial effect of the collateral evidence to far outweigh its probative value. Even when inextricably intertwined, such evidence cannot become a feature of the trial.
 
 See Morrow v. State,
 
 981 So.2d 1021, 1022 (Fla. 3d DCA 2006) (citing
 
 Bryan v. State,
 
 533 So.2d 744, 746 (Fla.1988)). To determine whether collateral-crime evidence became a feature of the trial, we do not solely measure the number of references the prosecution made to such evidence.
 
 See Morrow,
 
 931 So.2d at 1022-23 (citing
 
 Snowden v. State,
 
 537 So.2d 1383, 1385 (Fla. 3d DCA 1989)). However, voluminous references to a collateral crime
 
 may indicate
 
 a prohibited transgression, even if it is not the sole determining factor.
 
 See Fitzsimmons v. State,
 
 935 So.2d 125, 129 (Fla. 2d DCA 2006) (evaluating the number of witnesses who testified concerning the collateral-crime evidence or the prosecutor’s references to it during closing argument to determine whether it became a feature of the trial).
 

 Wright asserts that this case is similar to those instances in which courts have held that inextricably intertwined evidence erroneously became a feature of the trial. For example, in
 
 Thomas v. State,
 
 959 So.2d 427 (Fla. 2d DCA 2007), the Second District remanded for a new trial where the evidence of drive-by shootings subsequent to the charged offense became a prejudicial feature of the trial. The defendant was involved in a “war” with the victim, who was a drug dealer.
 
 See id.
 
 at 427. More than a year prior to the murder, the defendant had stolen $95,000 from the victim, causing the victim to place a contract for the murder of the defendant.
 
 See id.
 
 The defendant later shot the victim in a drive-by encounter.
 
 See id.
 
 The two days following the murder involved multiple drive-by shootings between associates of the defendant and the victim, which resulted in the defendant’s apprehension and the discovery of the murder weapon.
 
 See id.
 
 at 428.
 

 A distinguishing feature of
 
 Thomas
 
 is that the defendant there stipulated to killing the victim but argued the killing was in self-defense, which reduced the litigation to only the issue of the defendant’s mental state at the time of the murder.
 
 See id.
 
 at 427-28. The defense agreed to the introduction of the stolen money, which explained why the murders occurred, and to limited details of the chase that led to the defendant’s apprehension.
 
 See id.
 
 at 429. These admissible facts are very similar to the circumstances of Wright’s case, where the Providence Road foot chase established Wright’s arrest and the recovery of the murder weapon. The Second District did not deem those facts irrelevant; instead, the court reversed because the State introduced voluminous evidence of the drive-by shootings, which did not have any relevancy to the limited issues before the jury and was unnecessary to “adequately describe the deed” for which the defendant was being tried.
 
 See id.
 
 at 430.
 
 *294
 
 Thus,
 
 Thomas
 
 is clearly distinguishable from the present case because Wright’s guilt remained an issue during the trial, which required the State to introduce evidence of the collateral events to connect Wright to possession of the weapons used in the murders and that he had been in the victim’s car.
 

 Unlike
 
 Thomas,
 
 the volume of detailed testimony of the collateral events here did not equate to the State proceeding “almost as if it had ... consolidate^] the various charges.”
 
 Id.
 
 at 430. Wright incorrectly asserts that more than half of the witnesses who testified during trial related in whole or in part to the collateral-crime evidence. Approximately fourteen of the fifty-five witnesses testified exclusively with regard to collateral crimes. Some witnesses who testified with regard to direct evidence of the murders also mentioned the collateral crimes in passing. The trial court did not consider the testimony regarding the Providence Road foot chase to be a collateral crime because
 
 mere possession
 
 of a firearm by a non-felon is not a crime, and the court did not admit testimony relating to the collateral crime for which Wright was acquitted. The testimony of the remaining witnesses was directly related to the double homicide, and one State rebuttal witness disputed Wright’s testimony. Even a quantitative analysis of the number of witnesses utilized does
 
 not
 
 indicate that the inextricably intertwined collateral-crime evidence became a voluminous feature of the trial beyond its relevant scope.
 

 Another area that may reveal whether collateral crimes became a feature of the trial is the closing argument.
 
 See Fitzsimmons,
 
 935 So.2d at 129. The State referenced the collateral crimes during its closing argument for two purposes: (1) to show that Wright possessed the firearm throughout the crime spree, and (2) to refute Wright’s testimony that Samuel Pitts was in possession of the firearm during the time the murders occurred. The collateral crimes were discussed only for a few moments during the closing argument. This alone does not demonstrate that evidence of the collateral crimes became a feature of the trial.
 

 We caution the State that some of the arguments appear to have crossed the line into asserting that Wright’s propensity for violence proved that he committed the murders. For instance, the State maintained that Wright “doesn’t have any problems shooting people.” This theme was mentioned again in reference to the carjacking.
 
 [18]
 

 
 *295
 
 In
 
 Consalvo v. State,
 
 697 So.2d 805 (Fla.1996), this Court stated that inextricably intertwined evidence may be admissible for one purpose, yet inadmissible for another purpose.
 
 See id.
 
 at 813 (citing § 90.107, Fla. Stat. (1995));
 
 see also Parsons v. Motor Homes of Am., Inc.,
 
 465 So.2d 1285, 1290 (Fla. 1st DCA 1985). Admission of material evidence does not automatically mean that such evidence may be received for
 
 any probative value
 
 that it may have on
 
 any issue
 
 before the court. The State in
 
 Consalvo
 
 improperly argued a collateral burglary as collateral-crime evidence in closing argument. The State had highlighted the similarities between the collateral burglary and the charged burglary and murder. We held that the State presented improper argument because the collateral burglary was admitted as evidence inextricably intertwined with the murder,
 
 not
 
 as collateral-crime evidence. Thus, the State’s use of evidence of the collateral burglary exceeded the scope of its admission, which was to establish the entire context out of which the criminal action occurred.
 

 Here, the evidence of collateral crimes was admitted for the limited purpose of tracing the possession of the firearm and the victim’s vehicle to Wright and to map a geographical nexus of the murder. Multiple statements that Wright “certain[ly] doesn’t have any problems shooting people” lean toward an impermissible propensity-toward-violence argument.
 
 See
 
 § 90.404(2)(a) (classifying as inadmissible evidence that is relevant solely to prove bad character or propensity). The State had received the benefit of each evidentia-ry ruling in that it was allowed to fully present its case, which included detailed testimony of the collateral crimes. However, when it cast Wright as a violent character who acts upon his desire to shoot people, the State abused this benefit by inappropriately taking it beyond the edge of propriety in contradiction of the evidence doctrine of Florida.
 

 Ultimately, in
 
 Consalvo,
 
 we determined that the prosecutor’s improper comments constituted harmless error because no objection was raised to that usage throughout the trial, and the similarities between the two crimes did not become a feature of the trial. We reach the same result here. Defense counsel did not object to the State’s use of the evidence during closing argument. As a general rule, “failing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review.”
 
 Brooks v. State,
 
 762 So.2d 879, 898 (Fla.2000);
 
 see also Poole v. State,
 
 997 So.2d 382, 390 (Fla.2008). The exception to this general rule is where the unpre-served comments rise to the level of fundamental error, which this Court has defined as “error that ‘reaches down into the validity of the trial itself to the extent that a verdict of guilty ... could not have been obtained without the assistance of the alleged error.’ ”
 
 Brooks,
 
 762 So.2d at 899 (quoting
 
 McDonald v. State,
 
 743 So.2d 501, 505 (Fla.1999)). However, here it has been conceded that the prosecutor’s closing argument was not so egregious as to be the basis for a challenge on appeal. In light of this concession and the lack of contemporaneous objection at the trial court level, we determine that the suspect comments during closing argument here were not properly preserved for appellate
 
 *296
 
 review and do not constitute fundamental error.
 

 Prejudice
 

 Wright also contends that the prejudicial impact of this testimony outweighed any probative value. Relevancy is not the only test for admissibility. In every case, the trial court must also balance whether the probative value of the relevant evidence is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.
 
 See
 
 § 90.403, Fla. Stat. (2000). As a practical matter, generally any evidence introduced by the State during a criminal prosecution is prejudicial to a defendant.
 
 See Sexton,
 
 697 So.2d at 837 (citing Amoros
 
 v. State,
 
 531 So.2d 1256, 1258 (Fla.1988)). “[A] trial judge must balance the import of the evidence with respect to the case of the party offering it against the danger of unfair prejudice. Only when the unfair prejudice
 
 substantially
 
 outweighs the probative value of the evidence should it be excluded.”
 
 Id.
 
 (emphasis supplied).
 

 “Unfair prejudice” has been described as “an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.”
 
 Brown v. State,
 
 719 So.2d 882, 885 (Fla.1998) (quoting
 
 Old Chief v. United States,
 
 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)). This rule of exclusion “is directed at evidence which inflames the jury or appeals improperly to the jury’s emotions.”
 
 Steverson v. State,
 
 695 So.2d 687, 688-89 (Fla.1997). In performing the balancing test to determine if the unfair prejudice outweighs the probative value of the evidence, the trial court should consider
 
 the need for the evidence,
 
 the
 
 tendency
 
 of the evidence to suggest an
 
 emotional basis for the verdict,
 
 the
 
 chain of inference
 
 from the evidence necessary to establish the material fact, and the
 
 effectiveness of a limiting instruction. Taylor v. State,
 
 855 So.2d 1, 22 (Fla.2003). The trial court is obligated to exclude evidence in which unfair prejudice outweighs the probative value in order to avoid the danger that a jury will convict a defendant based upon reasons other than evidence establishing his guilt.
 

 McDuffie v. State,
 
 970 So.2d 312, 327 (Fla.2007) (emphasis supplied).
 

 As a preliminary matter, Wright contends that the prejudicial impact of the collateral-crime witnesses could have been minimized by use of Wright’s prior testimonial admissions to prove his possession of the murder weapon, thus limiting the prejudicial effect of the collateral-crimes witnesses’ testimony. However, it is unlikely that the testimony from the prior mistrials could have been used save for impeachment purposes or by joint stipulation of counsel. At the beginning of the final trial, the defense requested that the trial court treat Wright’s prior testimony as judicial admissions. The State attempted to reach a stipulation with Wright, but he declined to stipulate to the facts of any of the collateral crimes. Defense counsel asked the trial court to conduct a colloquy with the defendant to ensure this was Wright’s decision. Therefore, the State’s presentation of these witnesses was not in error because Wright affirmatively decided not to stipulate to these facts. On appeal, Wright does not specify how these facts could have been properly introduced without presenting the testimony of the collateral-crimes witnesses.
 

 Considering the evidence that was admitted, the introduction of the drive-by shooting and the carjacking might imply Wright was a “violent man” because the acts were violent in nature and involved
 
 *297
 
 attempted murders and dangerous shootings. However, to excise the drive-by shooting and the carjacking from the trial would have eliminated the essential ballistics evidence that connected Wright and the pistol used in those crimes to the evidence found at the orange grove where the murders occurred. This link was necessary because the firearms expert was unable to conclusively state that the bullets recovered from the scene of the murders were fired from the Shank pistol. Instead, the expert was able to confirm that the bullet lodged in the Longfellow Boulevard house was fired by the Shank pistol and had a similar casing to those discovered in the orange grove. This ballistics evidence was highly probative to linking the Shank pistol with the murder. Furthermore, the carjacking placed Wright in possession of one of the murder weapons and in the vicinity of the murder scene immediately after the murders probably occurred. Thus, the carjacking and drive-by shooting were integral threads to weaving a complete story of the murders. To pluck any one thread may have unraveled the true evidence. Under the deferential standard of abuse of discretion, we conclude that the trial court did not abuse its discretion in allowing admission of this testimony.
 

 Ring
 
 claim
 

 Wright next asserts that the trial court erred in denying his motions to declare Florida’s capital sentencing scheme unconstitutional pursuit to
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 
 [19]
 
 We affirm the trial court’s denial of these claims for two reasons. First, Wright waived his right to a penalty-phase jury.
 
 See Bryant v. State,
 
 901 So.2d 810, 822 (Fla.2005) (holding
 
 Ring
 
 claim legally insufficient where defendant waived his penalty-phase jury);
 
 Lynch v. State,
 
 841 So.2d 362, 366 n. 1 (Fla.2003) (substantially similar). Wright knowingly, intelligently, and voluntarily waived his right to a penalty-phase jury, as evidenced by the trial court’s colloquy with Wright during which the trial court explained the impact of a waiver and specifically informed Wright of the consequences on appeal. Wright confirmed that it was his knowing intention to waive his penalty phase jury. The trial court concluded that the waiver had been made after a full consultation with counsel, that it appeared to be a tactical decision on the part of the defense based on counsel’s statements, and that the waiver was knowingly, intelligently, and voluntarily made.
 

 Wright does not present any evidence contrary to the finding of the trial court. In fact, Wright concedes that he waived his right to a penalty-phase jury, thus barring this claim, and submits that the waiver was a strategic decision based on the possible “contamination” of the jury by the trial court’s admission of collateral-crime evidence during the guilt phase. Wright chose the trial court to be the finder of fact because it was his view that the trial court would be more likely to dispassionately consider the aggravating and mitigating circumstances in light of any emotional impact the collateral-crime evidence may have had on the guilt-phase jury. This is no different from the choice that every capital defendant must make
 
 *298
 
 when deciding whether to waive the right to a penalty-phase jury. Wright’s strategic decision to present the penalty phase of the case to the trial court instead of a jury constitutes a knowing, intelligent, and voluntary waiver and a conscious abandonment of any i?mp-based challenges to the constitutionality of Florida’s capital-sentencing scheme.
 

 Moreover, even if Wright’s waiver did not preclude review of this issue, we have repeatedly held that where a death sentence is supported by the prior-violent-felony aggravating circumstance, Florida’s capital-sentencing scheme does not violate
 
 Ring. See, e.g. Peterson v. State,
 
 2 So.3d 146, 160 (Fla.2009) (citing
 
 Frances v. State,
 
 970 So.2d 806, 822 (Fla.2007),
 
 cert. denied,
 
 - U.S. -, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008);
 
 Lebrón v. State,
 
 982 So.2d 649 (Fla.2008)),
 
 petition for cert0. filed,
 
 No. 09-5057 (U.S. June 25, 2009). Thus, relief is not warranted on this issue.
 

 Aggravating Factors
 

 Wright next challenges the finding of two aggravating circumstances: (1) that the murder was committed in a cold, calculated, and premeditated (CCP) manner, and (2) that the murder was committed to avoid arrest. A murder may be both cold, calculated, and premeditated and also committed to avoid arrest. The CCP aggravating circumstance focuses on the defendant’s state of mind and the manner in which the defendant executed the capital offense, whereas the avoid-arrest aggravating circumstance focuses on the defendant’s motivation for the crime.
 
 See Rodriguez v. State,
 
 753 So.2d 29, 48 (Fla.2000). When an aggravating factor is challenged on appeal, we review the record to determine whether the trial court applied the correct rule of law for each aggravating circumstance, and, if so, whether competent, substantial evidence supports the trial court’s finding.
 
 See Douglas v. State,
 
 878 So.2d 1246, 1260-61 (Fla.2004) (quoting
 
 Willacy v. State,
 
 696 So.2d 693, 695 (Fla.1997)). The record in this case contains competent, substantial evidence to support the trial court’s finding as to each aggravating circumstance.
 

 Cold, Calculated, and Premeditated
 

 The CCP aggravator pertains specifically to the state of mind, intent, and motivation of the defendant.
 
 See Brown v. State,
 
 721 So.2d 274, 277 (Fla.1998). Wright first asserts that the trial court could not logically find CCP when it also found that the capital felony was committed while Wright was under the influence of an extreme mental or emotional disturbance at the time of the crime. One of the defense mental health experts indicated that Wright’s neurological brain damage could have affected his ability to fully appreciate future consequences or to premeditate plans or intent. Wright maintains that his mental health condition would make it impossible for him to create a prearranged design to kill or to formulate “a cold-blooded intent to kill that is more contemplative, more methodical, more controlled than that necessary to sustain a conviction for first-degree murder.”
 
 Evans v. State,
 
 800 So.2d 182, 193 (Fla.2001) (quoting
 
 Nibert v. State,
 
 508 So.2d 1, 4 (Fla.1987)).
 

 In
 
 Evans,
 
 this Court reasoned that even if a trial court recognizes and gives substantial weight to mental health mitigation, such does not necessarily mean that a murder was an act prompted by emotional frenzy, panic, or a fit of rage.
 
 See
 
 800 So.2d at 193. “A defendant can be emotionally and mentally disturbed or suffer from a mental illness but still have the ability to experience cool and calm reflection, make a careful plan or prearranged design to commit murder, and exhibit heightened premeditation.”
 
 Id.
 
 (citing
 
 *299
 

 Sexton,
 
 775 So.2d at 934). Though it is possible that the crime spree and events leading up to these murders may have emotionally charged Wright, his admissions to his actions at the time of the murder — abducting the victims, exiting the ear, and shooting each victim execution-style — do not suggest a frenzied, spur-of-the-moment attack. In addition, while one expert’s testimony very strongly indicated that Wright lacked the capacity to appreciate his criminality, that Wright suffered brain damage, and that Wright would have “trouble premeditating activities of daily living,” the other three experts expressed the opinion that Wright’s mental capabilities did not qualify him as being mentally retarded or under emotional duress at the time of the offenses.
 

 In contrast to
 
 Evans,
 
 in Woods
 
 v. State,
 
 733 So.2d 980 (Fla.1999), this Court rejected the CCP factor where the defendant had limited mental ability and apparently resorted to violence based upon the irrational belief that the victims were wrongfully keeping property from him.
 
 See id.
 
 at 992. Two key factors in
 
 Woods
 
 revolved around the defendant’s low IQ and his irrational behavior, such as calling the police multiple times to report that the victims would not permit him to drive a vehicle that he claimed to have purchased. The evidence in the present case does not suggest that Wright’s microcephaly led to any irrational beliefs or behavior beyond these criminal actions. Thus, although we recognize that certain evidence may indicate some inability for Wright to premeditate daily activities, we conclude that the mental health evidence does not eradicate the evidence that he committed these murders in a cold, calculated, and premeditated manner.
 

 Indeed, the evidence reflects competent, substantial evidence to support each element of CCP. The cold element is generally found in those murders that are not committed in a heat of passion.
 
 See Looney v. State,
 
 803 So.2d 656, 678 (Fla.2001) (quoting
 
 Walls v. State,
 
 641 So.2d 381, 387-88 (Fla.1994)). The record is devoid of any evidence that Wright acted out of frenzy, panic, or rage. Two witnesses presented evidence of consistent admissions by Wright regarding how the murders occurred. Wright told these witnesses that he drove the victims to a remote, isolated orange grove ten miles from where they were carjacked. After the victims insisted that they had nothing to surrender, Wright exited the vehicle and shot one of the victims. Wright then shot the other victim, who was pleading that Wright not to commit the murder. While one of the victims was still breathing, crawling, and moaning, Wright shot him in the head with a shotgun. By their very nature, execution-style killings satisfy the cold element of CCP.
 
 See Ibar v. State,
 
 938 So.2d 451, 473 (Fla.2006) (citing
 
 Lynch v. State,
 
 841 So.2d 362 (Fla.2003);
 
 Walls,
 
 641 So.2d at 388). Similar to the circumstances in
 
 Walls
 
 and
 
 Ibar,
 
 Wright had ample opportunity during the ten-mile abduction drive to the orange grove to reflect on his actions and abort any intent to kill. Instead, Wright chose to shoot each victim in the head at close range.
 
 See Ibar,
 
 938 So.2d at 473. These actions establish the cold nature of the murders.
 

 The calculated element applies in cases where the defendant arms himself in advance, kills execution-style, plans his actions, and has time to coldly and calmly decide to kill.
 
 See id.
 
 (citing
 
 Lynch,
 
 841 So.2d at 372). Wright armed himself before the carjacking with weapons that he had stolen from the Shank residence the previous day. The drive to the orange grove afforded Wright time to coldly and calmly make the final plan and decision to kill the victims.
 
 See Knight v. State,
 
 746
 
 *300
 
 So.2d 423, 436 (Fla.1998). Though some testimony suggests that the victims “resisted,” this testimony did not indicate physical resistance.
 
 Cf. Barwick v. State,
 
 660 So.2d 685, 686, 696 (Fla.1995) (finding that murder was not committed in a calculated manner where it occurred after the victim resisted and during an unexpected struggle). One of the victims was found with his hand outstretched, holding his wallet. Each victim was shot multiple times, despite there being no indication of victim resistance or of a struggle that provoked the murder. Additionally, a shotgun is not a small, easily concealed weapon that can be conveniently and easily carried. Therefore, to carry both a shotgun and a handgun to the orange grove demonstrates calculation and premeditation.
 

 Furthermore, to prove the element of heightened premeditation, the evidence must show that the defendant had a careful plan or prearranged design to kill, not to just simply commit another felony.
 
 See Geralds v. State,
 
 601 So.2d 1157, 1163 (Fla.1992) (citing
 
 Jackson v. State,
 
 498 So.2d 906, 911 (Fla.1986);
 
 Hardwick v. State,
 
 461 So.2d 79, 81 (Fla.1984)). However, this element exists where a defendant has the opportunity to leave the crime scene with the victims alive but, instead, commits the murders.
 
 See Alston v. State,
 
 723 So.2d 148, 162 (Fla.1998) (quoting
 
 Jackson v. State,
 
 704 So.2d 500, 505 (Fla.1997)). In this case, Wright had ample opportunity, from the time he encountered the victims in the supermarket parking lot to when he stopped the car in the orange grove, to release the victims and leave the crime scene without committing two murders. Instead, when the victims stated that they had nothing to surrender, he exited the car and shot them both execution-style.
 

 Finally, there is no evidence establishing a pretense of moral or legal justification for these murders. “A pretense of legal or moral justification is ‘any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.’ ”
 
 Nelson v. State,
 
 748 So.2d 237, 245 (Fla.1999) (quoting
 
 Walls,
 
 641 So.2d at 388). Wright does not dispute the lack of any pretense of moral or legal justification for the slayings, and the record lacks any indication of a single fact that could provide such justification.
 

 While CCP may be established by circumstantial evidence, this Court will consider any reasonable hypothesis of innocence offered by the defense that might be inconsistent with and negate this aggravating factor.
 
 See Gordon v. State,
 
 704 So.2d 107, 114 (quoting
 
 Geralds v. State,
 
 601 So.2d 1157, 1163 (Fla.1992)). Though the “plan to kill” cannot be inferred solely from a plan to commit another felony, Wright failed to offer an alternative theory for the offenses, such as an unplanned killing in the course of a planned burglary.
 
 See id.
 
 at 1163-64. This is not a case where one hypothesis supports premeditated murder, and another cohesive, reasonable hypothesis supports an unplanned killing.
 
 Cf. Geralds,
 
 601 So.2d at 1164 (vacating CCP where defendant presented a reasonable, alternate hypothesis, and the evidence regarding premeditation was susceptible to divergent interpretations).
 

 In sum, Wright did not act out of frenzy, panic, or rage; he obtained a firearm in advance; he abducted and forced the victims to drive to a remote area where there would be no witnesses; and he shot the victims multiple times execution-style.
 
 See Hartley v. State,
 
 686 So.2d 1316, 1323 (Fla.1996) (finding competent, substantial evidence of CCP with these same factors, along with defendant’s confession and ob-
 
 *301
 
 taming a getaway vehicle in advance). Thus, the trial court did not err in finding that this factor was proven beyond a reasonable doubt because there is competent, substantial evidence in the record that the murder was committed in a cold, calculated, and premeditated fashion without any pretense of moral or legal justification.
 

 Avoid Arrest Aggravator
 

 The avoid arrest aggravating circumstance, which is also referred to as witness elimination, applies when the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or to effectuate an escape from custody.
 
 See
 
 § 921.141(5)(e), Fla. Stat. (2004). Typically, this aggravator is applied to the murder of law enforcement personnel, but it has also been applied to the murder of a witness to a crime.
 
 See Consalvo,
 
 697 So.2d at 819 (citing
 
 Riley v. State,
 
 366 So.2d 19, 22 (Fla.1978)). Where the victim is not a law enforcement officer, the evidence must demonstrate beyond a reasonable doubt that “the sole or dominant motive for the murder was the elimination of the witness.”
 
 Preston v. State,
 
 607 So.2d 404, 409 (Fla.1992);
 
 see also Reynolds v. State,
 
 934 So.2d 1128, 1157 (Fla.2006);
 
 Connor v. State,
 
 803 So.2d 598, 610 (Fla.2001). In those circumstances, proof of the intent to avoid arrest or detection must be very strong and not based on mere speculation.
 
 See Consalvo,
 
 697 So.2d at 819.
 

 Foremost, Wright conceded that this aggravator applied by stating in his supplemental amended memorandum in support of the imposition of a life sentence:
 

 5) Witness Elimination § 921.141(5)(e). The
 
 Defense concedes that the State has proven beyond a reasonable doubt that the two victims appear to have been killed ... in order for the perpetrator to avoid being caught in this case.
 
 Again, as to the weight to be granted to this factor the court should reflect upon the roles of the co-defendants and the principals theory. Ultimately the defense concedes proof of the apparent motive to eliminate the witness. Due to the lack of [p]roof of the defendant’s direct participation in the killings and the mental mitigation suggesting dominance by an intelligent authority figure in the co-defendant, the defense emphasizes that the quantum of culpability required for the imposition of the death penalty with regard to this defendant is absent.
 

 b. The State has proven beyond a reasonable doubt that the victims were killed to eliminate witnesses but the court should grant only some weight to this factor.
 

 In conclusion, the defense believes that the State has proven beyond a reasonable doubt only [a]ggravators number one, three and five.... The defense believes that the court should grant ... some weight ... for Witness Elimination.
 

 (Emphasis supplied.) The memorandum was signed by both defense counselors.
 

 On appeal, Wright now asserts that trial counsel did not concede that the aggravator had been proven beyond a reasonable doubt because defense counsel contended, during the sentencing hearing, that the court could
 
 “presume
 
 [Wright and Pitts] were eliminating witnesses” if the State’s theory was true, but that a presumption is not equal to the standard of proof beyond a reasonable doubt.
 
 [20]
 

 
 *302
 
 This Court has held that an aggravator was not conceded where defense counsel attempted to emphasize that the State had not proven the aggravator beyond a reasonable doubt.
 
 See Stephens v. State,
 
 975 So.2d 405, 417 (Fla.2007). However, defense counsel’s contention at sentencing does not reflect this strategy. It is clear that the sentencing memorandum combined with the defense’s “presumption” contention during the hearing conceded this aggravating factor.
 

 Even so, the trial court found that avoiding arrest was proven beyond a reasonable doubt to be the dominant motive for the murder based on the following:
 

 The evidence established that the victims in the case at bar were car-jacked,
 
 driven several miles to an isolated area
 
 far outside the city where the car-jacking occurred, taken out into the
 
 middle of an orange grove,
 
 and shot from behind
 
 execution style
 
 while literally holding a cap and empty wallet in hand. Had the victims been merely dropped off and abandoned alive in this isolated area, restrained or even unrestrained, without the vehicle (which was taken) or means of communication such as the cellphone (which was also taken), it would likely have been a considerable period of time before the victims could have either gotten help or located other persons to hear a cry of alarm. The isolated nature of the area where the victims were eventually found assured any perpetrator of ample getaway time without the necessity of killing the victims.
 

 The murders of David Green and James Felker were witness elimination. They certainly posed
 
 no physical threat to an abductor,
 
 turned away as they were from their killer or killers, ballcap and wallet in hand. There is
 
 no evidence of any violent resistance
 
 as their vehicle and personal belongings were being taken. The killings were
 
 not necessary to effectuate the carjacking, kidnappings, or armed robberies.
 

 (Emphasis supplied.)
 

 We have upheld this aggravator in circumstances where the victim was taken from the initial location of the carjacking and driven to an isolated, remote place to be executed.
 
 See Spann v. State,
 
 857 So.2d 845 (Fla.2003);
 
 Philmore v. State,
 
 820 So.2d 919 (Fla.2002). In
 
 Spann
 
 and
 
 Philmore,
 
 which involved a murder by two codefendants, a random victim was carjacked, forced to a remote, isolated location, robbed of property, and murdered execution-style. The defendants in each case did not wear masks or gloves to conceal their identities. Similarly, there is competent, substantial evidence to support the trial court’s findings that Wright drove the victims to a remote location where he could have abandoned them with ample time to escape detection, but instead chose to shoot them execution-style. Furthermore, there is no evidence to suggest that Wright attempted to conceal his identity. Thus, even without defense counsel’s concession of this aggravator, the trial court did not err by finding that the dominant or sole motive of these murders was witness elimination.
 

 Sufficiency
 

 Although Wright has not asserted that the evidence is insufficient to support his convictions, we have an obligation to independently review the entire record to determine whether sufficient evi
 
 *303
 
 dence exists.
 
 See Bevel v. State,
 
 983 So.2d 505, 516 (Fla.2008);
 
 see also
 
 Fla. R.App. P. 9.142(a)(6). In making this determination, we review the facts in the light most favorable to the State to determine whether the record provides competent, substantial evidence that supports the existence of the elements of each capital offense.
 
 See Simmons v. State,
 
 934 So.2d 1100, 1111 (Fla.2006). We have reviewed the record and conclude that the evidence is sufficient to support both of Wright’s murder convictions on either theory of first-degree murder as well as each of his remaining five convictions.
 

 Proportionality
 

 Despite Wright’s failure to raise proportionality on appeal, this Court is required to perform a proportionality analysis in each direct capital appeal.
 
 See
 
 Fla. R.App. P. 9.142(a)(6);
 
 Floyd v. State,
 
 913 So.2d 564, 578 (Fla.2005). This Court performs a proportionality review to prevent the imposition of “unusual” punishments contrary to article I, section 17 of the Florida Constitution.
 
 See Tillman v. State,
 
 591 So.2d 167, 169 (Fla.1991). “[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both
 
 the most aggravated
 
 and
 
 the least mitigated
 
 of murders, thereby assuring uniformity in the application of the sentence.”
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003) (emphasis supplied) (citation omitted). This review “is not a comparison between the number of aggravating and mitigating circumstances.”
 
 Sexton v. State,
 
 775 So.2d 923, 935 (Fla.2000) (quoting
 
 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990)). In deciding whether death is a proportionate penalty, we consider the totality of the circumstances and compare the present case with other capital cases in which this Court has found that death was a proportionate punishment.
 
 See Urbin v. State,
 
 714 So.2d 411, 417 (Fla.1998). We have reviewed the nature of, and the weight given to, the aggravating and mitigating circumstances, and we approve the trial court’s determination that death is a proportionate punishment in this case.
 
 See Frances v. State,
 
 970 So.2d 806, 820 (Fla.2007), ce
 
 rt. denied,
 
 — U.S. -, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008).
 

 Comparison to Other Cases
 

 Here, Wright waived a penalty-phase jury, so the sentences were imposed by the trial court. The trial court found four aggravating factors: (1) Wright was previously convicted of another capital felony or of a felony involving the use or threat of violence to a person (great weight);
 
 [21]
 
 (2) Wright committed the murders for pecuniary gain (no additional weight); (3) Wright committed the murders in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (great weight); and (4) Wright committed the murders for the purpose of avoiding or preventing lawful arrest (great weight).
 

 The trial court found three statutory mitigating circumstances: (1) the offenses were committed while Wright was under the influence of extreme mental or emotional disturbance (some weight); (2) Wright’s capacity to appreciate the criminality of his conduct or to conform his
 
 *304
 
 conduct to the requirements of the law was substantially impaired (some weight); and (3) Wright was nineteen years old at the time of the crime (some weight). The court found several nonstatutory miti-gators relating to Wright’s background and mental health.
 

 This Court has previously determined that the death penalty is a proportionate sentence in cases that involved multiple murders and extensive aggravation.
 
 See Pearce v. State,
 
 880 So.2d 561 (Fla.2004) (finding three aggravating circumstances — CCP, prior violent felony, and murder committed during a kidnapping— and few mitigating circumstances);
 
 Spann v. State,
 
 857 So.2d 845 (Fla.2003) (finding five aggravating circumstances — -prior violent felony, murder committed in the course of a felony, avoid arrest, pecuniary gain, and CCP-and six nonstatutory mitigating circumstances);
 
 Philmore v. State,
 
 820 So.2d 919 (Fla.2002) (twenty-one-year-old codefendant to Spann, finding five ag-gravators and eight nonstatutory miti-gators). Each of these cases shares the factual circumstance of the defendant driving a victim to an isolated place and shooting him or her execution-style.
 

 It is clear that the aggravating factors here support the imposition of the death penalty. In total, Wright was convicted of contemporaneous capital felonies for the double murders, five violent felonies for the carjacking, armed robberies, and kidnappings, three violent felonies from the drive-by shooting, and two violent felonies from the prison batteries. Additionally, the CCP aggravator is one of the most serious aggravators provided by the statutory sentencing scheme.
 
 See Larkins v. State,
 
 739 So.2d 90, 95 (Fla.1999). Furthermore, a comparison of other cases reveals that this Court has upheld the imposition of the death penalty in cases involving similar aggravating circumstances.
 
 See Jones v. State,
 
 690 So.2d 568, 571 (Fla.1996) (in calculated double murder, this Court found death proportionate with three aggravating circumstances — CCP, contemporaneous attempted murder of second victim, and pecuniary gain — and one statutory mitigating circumstance);
 
 Pope v. State,
 
 679 So.2d 710, 716 (Fla.1996) (in violent beating and stabbing homicide, this Court held the death penalty proportionate where the two aggravating factors found — murder committed for pecuniary gain and prior violent felony— outweighed the two statutory mitigating circumstances — commission while under the influence of extreme mental or emotional disturbance and impaired capacity to appreciate criminality of conduct — and three nonstatutory mitigating circumstances);
 
 Heath v. State,
 
 648 So.2d 660, 666 (Fla.1994) (in robbery where defendant stabbed victim in the neck after ordering his brother to shoot the victim, this Court affirmed death sentence based on two aggravating factors of prior violent felony and murder committed during the course of a robbery, and the existence of one statutory mitigating circumstance).
 

 When mental health mitigation reveals a mentally disturbed defendant, we have vacated the death penalty under appropriate circumstances even when the heinous, atrocious, and cruel aggravating circumstance was found. These cases are distinguishable, however, because generally only a single aggravator was found.
 
 See Offord v. State,
 
 959 So.2d 187, 192 (Fla.2007) (discussing
 
 Robertson v. State,
 
 699 So.2d 1343 (Fla.1997);
 
 Kramer v. State,
 
 619 So.2d 274, 278 (Fla.1993);
 
 Nibert v. State,
 
 574 So.2d 1059, 1063 (Fla.1990)). Here, Wright has three weighted aggravating factors.
 

 Lastly, there is no evidence that this crime occurred during a “robbery gone bad,” in which there is little or no evidence
 
 *305
 
 of what happened immediately before the victim was shot.
 
 Cf. Jones v. State,
 
 963 So.2d 180, 188 (Fla.2007);
 
 Terry v. State,
 
 668 So.2d 954, 965 (Fla.1996);
 
 Sinclair v. State,
 
 657 So.2d 1138, 1142 (Fla.1995);
 
 Thompson v. State,
 
 647 So.2d 824, 827 (Fla.1994). Thus, we conclude that a comparison of the factual circumstances of this case with other capital decisions demonstrates that Wright’s death sentences are proportionate.
 

 Culpability of Codefendant
 

 Next, proportionality review requires us to consider the codefendant’s sentence. Wright was tried and sentenced to death before Samuel Pitts’ trial commenced. In May 2007, Samuel Pitts received a life sentence based on a jury recommendation. “In cases where more than one defendant is involved, the Court performs an additional analysis of relative culpability guided by the principle that ‘equally culpable co-defendants should be treated alike in capital sentencing and receive equal punishment.’ ”
 
 Brooks v. State,
 
 918 So.2d 181, 208 (Fla.2005) (quoting
 
 Shere v. Moore,
 
 830 So.2d 56, 60 (Fla.2002)).
 

 We have rejected relative culpability arguments where the defendant sentenced to death was the “triggerman.”
 
 See, e.g., Ventura v. State,
 
 794 So.2d 553, 571 (Fla.2001);
 
 Downs v. State,
 
 572 So.2d 895, 901 (Fla.1990). If the defendant is the primary shooter, this Court has stated in dicta that there would be no error in imposing the death penalty when an accomplice is also a triggerman where the evidence supports the sentencing judge’s conclusion that the defendant’s aggravating circumstances outweigh his or her mitigating circumstances.
 
 See Garcia v. State,
 
 492 So.2d 360 (Fla.1986) (citing
 
 Jacobs v. State,
 
 396 So.2d 1113 (Fla.1981)). “[A]n exercise of mercy on behalf of the defendant in one case does not [necessarily] prevent the imposition of death by capital punishment in the other case.”
 
 Alvord v. State,
 
 322 So.2d 533, 540 (Fla.1975). Though there was no eyewitness testimony to definitively determine which defendant was the triggerman, and the State advanced theories that both defendants were equal participants in the crime, the evidence presented at Wright’s trial supports a determination that he shot the victims. With regard to each murder, the jury found that Wright used, possessed, and discharged a firearm, which resulted in death to another. As to the physical evidence, only Wright’s fingerprints were found on the car, and Felker’s blood was found on Wright’s shoes. The jury apparently dismissed the assertion that the shoes actually belonged to Pitts, and the evidence demonstrated that the shoes fit Wright more closely than Pitts. Furthermore, appellate counsel conceded during oral argument that comparative culpability was not really an issue. Thus, Wright’s death sentences are not disproportionate when compared to the life sentences received by codefendant Pitts.
 

 CONCLUSION
 

 For the reasons expressed above, we affirm Wright’s convictions and sentences.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
 

 LABARGA and PERRY, JJ., did not participate.
 

 [1]
 

 .
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 

 [2]
 

 . Wright and Pitts were tried separately for the murders. Pitts was convicted of two counts of first-degree murder and other offenses related to this incident. He received sentences of life imprisonment for the murders.
 

 [3]
 

 .For the drive-by shooting, Wright was convicted of attempted second-degree murder and two counts of attempted felony murder.
 

 [4]
 

 . The stolen shotgun was never recovered. References to the firearm stolen from the Shank residence relate to the automatic pistol.
 

 [5]
 

 . However, a .380 handgun could not have fired the .25 caliber bullet. No explanation for the different shell casing was presented at trial, though it was implied by the defense that an exchange of gunfire occurred between Wright and the victims. Coney and Joiner denied having a firearm at the Longfellow Boulevard residence.
 

 [6]
 

 . Wright testified, to the contrary, that after he arrived at the supermarket, he conducted a drug transaction and then visited other apartments in the area to sell more drugs. After making stops at various apartments, he began walking back to the Providence Reserve Apartments. While he was walking, Pitts drove up in a white vehicle. Pitts asked Wright if he wanted to drive, and as Wright walked to the driver’s side, he noticed blood on the vehicle. Wright suggested that they take the vehicle to an apartment to wash it. Wright testified that it was while they were driving to the apartment that the police chase occurred.
 

 [7]
 

 . Wright refused to testify about the details of the carjacking because he was not charged with this offense.
 

 [8]
 

 . Wright was charged with aggravated assault related to this incident, but was acquitted.
 

 [9]
 

 . None of the latent prints lifted from the Chrysler matched the known fingerprints of Pitts or R.R.
 

 [10]
 

 . During trial, Green's fiancée identified the Polaroid camera as the one she purchased with Green. She also identified his black workbag.
 

 [11]
 

 .The first trial began in March 2003, but resulted in a mistrial after the State’s last rebuttal witness was presented. A second trial commenced in September 2003, but ended in mistrial because of a hung jury. Wright moved to recuse the trial judge after the second trial, because he had presided over four separate trials of Wright and sentenced Wright to the maximum penalty in each of the cases where Wright was convicted. These trials comprised the collateral crimes and pri- or felonies used in his capital trial. Consequently, a new trial judge presided over the proceedings.
 

 [12]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [13]
 

 . Prior to the capital trial, Wright was convicted of two violent felonies while in custody-aggravated battery by a jail detainee and aggravated battery. In the former, Wright, along with several other inmates, attacked another detainee. In the latter, Wright attacked a jail detention deputy.
 

 [14]
 

 . A defendant may seek to show the mitigating circumstances that (1) under section 921.141 (6)(b), Florida Statutes (2000), the "capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance,” or that (2) "the capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of the law was substantially impaired,” pursuant to section 921.141(6)(f).
 

 [15]
 

 . Section 921.137(1) defines mental retardation for purposes of the statutory determination to be "significantly subaverage general intellectual functioning,” which is "performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Agency for Persons with Disabilities,” with "deficits in adaptive behavior and manifested during the period from conception to age 18.” Consistently, we have interpreted this definition to mean a defendant seeking exemption from execution must establish an intelligence quotient score of 70 or below.
 
 See Phillips v. State,
 
 984 So.2d 503, 510 (Fla.2008).
 

 [16]
 

 . The trial court found four aggravating circumstances: (1) Wright was previously convicted of another capital felony or of a felony involving the use or threat of violence to a person (great weight); (2) Wright committed the felony for pecuniary gain (no weight); (3) Wright committed the homicide in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (great weight); and (4) Wright committed the felony for the purpose of avoiding or preventing lawful arrest (great weight).
 

 The trial court found three statutory mitigating factors and gave them some weight: (1) Wright committed the offense while under the influence of extreme mental or emotional disturbance; (2) Wright’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (3) Wright was 19 years old at the time of the crime. Wright offered approximately 34 nonstatutory mitigating factors, and the trial court found the following: (1) Wright suffered emotional deprivation during his upbringing (some weight); (2) Wright's low IQ affected his judgment and perceptions (some weight); (3) Wright suffered from neurological impairments, which affected his impulse control and reasoning ability (some weight); (4) Wright suffered from low self-esteem (little weight); (5) Wright lacked the capacity to maintain healthy, mature relationships (little weight); (6) Wright had frustration from his learning disability (little weight); (7) Wright lacked mature coping skills (some weight); (8) Wright displayed appropriate courtroom behavior (little weight); and (9) Wright suffered from substance abuse during his adolescent and adult life (little weight).
 

 [17]
 

 .
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959).
 

 [18]
 

 . For example, the State made the following statements during closing argument.
 

 He used the gun on Friday. He shot a man with it.
 
 He certain[ly] doesn't have any problems shooting people. He shot Carlos Coney.
 

 (Emphasis supplied.)
 

 When you have a carjacking and a murder like this that's senseless, it's an irrational act, and you cannot for the life of you understand why that happened.
 
 You’ll never understand why T.J. Wright chose to shoot Carlos Coney
 
 or chose to shoot Felker and Green. It’s — it’s an irrational thing to do.
 

 (Emphasis supplied.)
 

 Carlos Coney and Bennie Joiner both know the guy.
 
 He shoots them, a man that he knows.
 
 The mail' — the police come, he goes, "Yeah, who shot you?"
 

 "T.J. Wright shot me.”
 

 [[Image here]]
 

 You know, you can't believe T.J. This guy wants you to believe that somebody that he has an acrimonious relationship with, they don’t get along, he's driving by, sees the guy, has a gun in his car, and tells his buddy turn around and go back, I want to talk to him.
 

 Bull crap.
 
 He wanted to shoot him.
 
 That's why he told [the driver] to turn around. That's exactly what he did.
 
 He shot him.
 

 [[Image here]]
 

 
 *295
 
 But the second time, when you look at this map, after he dumped that car on Bo-lender Road and went and carjacked the Mexicans, he comes up to right there, and that’s where he flees. That’s where
 
 he shoots at Mr. Mendoza
 
 and the owner of the car who’s since died in a car accident. That’s where he shoots at him.
 

 [19]
 

 . In response to this issue, the State asserts that Wright improperly incorporated the
 
 Ring
 
 arguments from an initial brief in a separate appellate proceeding for a different defendant. Incorporation by reference or reference to issues from a brief in a separate and distinct case pending in this Court is improper.
 
 See Johnson v. State,
 
 660 So.2d 637, 645 (Fla.1995). As in
 
 Johnson,
 
 we again advise appellate counsel to avoid this method of legal argument because it may place this Court or opposing counsel in the speculative position of guessing which arguments counsel deems relevant to its case.
 
 See id.
 
 at 645.
 

 [20]
 

 . During the sentencing hearing, one of the defense attorneys stated:
 

 There's a heavy assumption on the third point about avoiding arrest or witness elimination. Again, we’re assuming what the facts in question are in this particular case. Certainly the State can say they had lots of other options, but we don't know what hap
 
 *302
 
 pened. We don't know what anyone was thinking, but
 
 we can presume they were eliminating witnesses,
 
 if they were both present, if it happened like the State’s theory of the case is, and if it didn't happen like the defense theory of the case.
 

 (Emphasis supplied.)
 

 [21]
 

 . As to this aggravating factor, this Court has repeatedly held that where a defendant is convicted of double murders arising from the same criminal episode, the contemporaneous conviction as to one victim may support the finding of the prior violent felony aggravator as to the murder of another victim.
 
 See, e.g., Francis v. State,
 
 808 So.2d 110, 136 (Fla.2001). Accordingly, the trial court correctly found that the conviction as to the Felker murder aggravated the conviction as to the murder of Green, and vice versa.