# Supreme Court of Florida

_____

No. SC2024-0096

_____

**MICHAEL H. HUNT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 18, 2025

PER CURIAM.

Michael Harrison Hunt appeals his first-degree murder conviction and death sentence, raising six issues for our review. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm.

## I.

### A. Factual Background

The State's evidence at trial established the following facts. On April 4, 2019, Alexandra Elise Peck (Lexie) was at home with her family in Panama City. Lexie lived with her mother Jenna, her

stepfather Danny, and her brother Gabe.  Gabe's girlfriend, P.O., and two friends, Brentley and Izac, were also living at the home. Around 10:30 p.m., a man knocked on the door claiming to have a pizza delivery.  Danny answered the door and told the man that no one in the home had ordered a pizza.  When Danny tried to shut the door, the man pushed it in, nearly knocking him over.  The man entered the home, pulling a gun from his waistband and holding it up to Danny's chin.  When the man did so, his face covering slipped back and Danny recognized him as Michael Hunt.  He also then recognized Hunt's "very distinctive" voice.

Once Danny saw the gun, he yelled "run" to the home's other occupants.  Hunt snatched Danny's cell phone from his hand and shot him in the neck.  After Danny fell to the floor, he heard a second, "totally different" voice, which was later presumed to be the voice of Hunt's accomplice.[1]  He heard several more gun shots coming from the home's back bedroom.  He also heard Lexie say "Dad, help me" and "Please don't kill me" before several more shots.

---

[1]  At the time of trial, there had been no arrest for Hunt's accomplice.  There were suspects, and it was still an ongoing investigation.

Knowing that Hunt would likely shoot him again, Danny crawled to the neighbor's house, where his neighbor called the police.

Meanwhile, Lexie had heard Danny's warning and ran into the home's back bedroom, where Brentley and Izac were staying. Hunt's accomplice followed her into the bedroom, where he shot Izac in the back before shooting Lexie in the back of the head. The accomplice shot Lexie and Izac again before shooting Brentley and running out of the room.

Danny, Brentley, and Izac survived with serious injuries. Lexie died at the scene. Although they were home, Gabe and P.O. were hiding on the other side of the house and were uninjured. Jenna was at work and was also uninjured. When the police arrived at the home, both Hunt and his accomplice had fled the scene.

The Panama City Police Department suspected that this murder was no random burglary and immediately identified Hunt as a suspect. The Panama City Police Department recovered shell casings and fired projectiles from the scene, which revealed that Danny was shot with a .380 caliber handgun. Lexie, Brentley, and Izac were shot with a .45 caliber handgun. Hunt was known to own

both types of weapons. About nine months after the murder, a .380 caliber semi-automatic pistol was recovered in a neighbor's bushes, and the police determined it was the weapon used to shoot Danny. At the scene, Danny told both his neighbor and several police officers that Hunt had shot him. During the shooting, Gabe was in the home's bathroom and heard Hunt's voice. But beyond the physical evidence and visual and voice identifications, the Panama City Police Department was already aware of the risk that Hunt posed to the family because of their connection through Gabe's girlfriend, P.O.

About a year and a half before the murder, sixteen-year-old P.O. met Hunt and began seeing him and his girlfriend, Kaitlyn West, on a regular basis. P.O. learned that Hunt owned a "dance studio" called "Polecats," which was advertised as an event space that people could rent out and throw parties. At some point in their relationship, Hunt took pictures of Kaitlyn and put them on a website without her consent to prostitute her. She did not say anything or leave him because Hunt beat her, and she was scared that he would do something to her or her family.

Several months later, P.O.'s mother kicked her out of the house, and P.O. began living with Hunt and Kaitlyn. One night after Hunt sent Kaitlyn out, P.O. was at the house alone with Hunt. She asked for ibuprofen for a headache, but Hunt gave her Xanax instead. Hunt covered the living room cameras and raped P.O. She did not report the incident to the police out of fear. Soon after, Hunt asked P.O. if she wanted to receive money in exchange for having sex with others. P.O. originally said no, but she "gave in" out of both "peer pressure" and fear. She knew that Hunt was doing the same with Kaitlyn. Hunt took P.O. and Kaitlyn "wherever" to sell them. P.O. testified that on one occasion, she was at Polecats with Hunt when he came up behind her and put a knife to her throat and said that if she ever told anyone, he would kill her. Much of the prostitution took place at Polecats. P.O. testified that she was trafficked for about a year and a half.

Eventually P.O. started dating Gabe, and after Hurricane Michael damaged Hunt and Kaitlyn's home, Hunt, Kaitlyn, P.O., and Gabe evacuated to Biloxi, Mississippi, and stayed there for about a month and a half. Sometime in the early months of 2019, the group made their way back to Panama City. When they

returned, Gabe stayed with Hunt, Kaitlyn, and P.O. for a short period. Almost daily, Hunt made multiple threats to him and P.O. about how he would "end" them if they told anyone about what was going on. Gabe had seen Hunt with firearms. Gabe eventually moved back in with his mother Jenna, his stepfather Danny, and his sister Lexie. At some point, Gabe's friends, Brentley and Izac, who had lost their homes in Hurricane Michael, also began living at the house. Hunt and Kaitlyn got to know the family during this period, as they often dropped P.O. off at the house so that she could spend time with Gabe.

Sometime in mid-February 2019, P.O., Kaitlyn, and Hunt went to their rented storage unit to retrieve their belongings. At the storage unit, Hunt and Kaitlyn got into a serious argument, and they demanded that P.O. choose between them. P.O. decided that she wanted to live with Gabe and his family, and Hunt did not object.

Shortly after she moved in with Gabe's family, P.O.'s acquaintance informed the Panama City Police Department that she knew of a "runaway juvenile" who was living with an adult. This information prompted a Department of Children and Families

investigation. Around the same time, P.O. confided in Gabe's mother Jenna about the sex crimes.[2] Up until this point, P.O. had not confided in anyone else, including Gabe. Corporal Corinne Clark of the Panama City Police Department met with P.O. at the home. Though not forthcoming at first, P.O. ultimately signed criminal complaints against Hunt.

After speaking with P.O., Clark developed a criminal case against Hunt and applied for an arrest warrant. She learned that Hunt had an upcoming court date for two unrelated criminal cases. The plan was to serve Hunt with the warrant for the sex crimes against P.O. and arrest him at the courthouse. When Hunt's cases were called, the assistant state attorney informed the trial judge that there was a new active arrest warrant against Hunt. Hunt also learned of the warrant against him at this time. The judge directed Hunt to wait while the court sorted out the warrant, and then took a recess because of unrelated noise in the gallery. When Hunt's

---

2. The term "sex crimes" refers to Hunt's alleged sexual battery of P.O. and the prostitution of P.O. and Kaitlyn.

case was recalled for service of the warrant, he was not present in the courtroom.

That afternoon, Hunt met up with Kaitlyn, and they went to Atlanta. It was during this trip that Hunt began preparations to murder P.O. Rather than taking Hunt's black Ford Explorer, the couple borrowed a family friend's Ford Escape. The couple first stopped in Dothan, Alabama, where they spent the night. There, Hunt purchased window tint and tinted the Ford Escape. Over the next two days, Hunt also purchased two untraceable phones, black sweatpants, and a black hoodie. On the way to Atlanta, Kaitlyn learned that P.O. had filed criminal charges against Hunt. Hunt told her twice that he would "do what he ha[d] to do," and "no witness, no case."

Meanwhile, while Hunt and Kaitlyn were in Atlanta, Clark learned that the police were not successful in arresting Hunt at the courthouse. The Panama City Police Department immediately began looking for him at all his known addresses and his acquaintances' addresses. They put out a "be on the lookout" for him. Danny and Jenna requested extra patrols at their home, which the police were already conducting. Clark was also working

with the Department of Children and Families to get P.O. into a safer place, but she did not want to leave Gabe.

Then, as detailed above, Hunt returned from Atlanta and went to P.O.'s home with an accomplice where they forced their way in, murdered Lexie, and attempted to murder Danny, Brentley, and Izac. They then fled to Atlanta. The day after the murder, the United States Marshals Service apprehended Hunt, who was wearing a woman's wig and the black hoodie, driving the Ford Escape toward Panama City.

## B. Pretrial Proceedings

Prior to trial, the State filed a notice under section 90.404(2)(a), Florida Statutes, of its intent to introduce evidence of Hunt's alleged sexual battery and prostitution of P.O. At the hearing for the notice, the State explained that the evidence was relevant to establish motive, identity, intent, and premeditation. Defense counsel objected to the use of the evidence as similar fact evidence but conceded that it was likely admissible because it was "inextricably intertwined"[3] with the allegation in this case. Defense

_____

3. "[E]vidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably

counsel requested that any evidence deemed admissible be "sanitized" so that it did not become a feature of the trial and was not unduly prejudicial to Hunt. The State agreed that the evidence was likely better classified as "inextricably intertwined" and explained that it filed the notice "out of an abundance of caution."

Ultimately, the parties agreed that this evidence was not *Williams*[4] rule evidence. The trial court determined that this evidence instead constituted "dissimilar fact evidence" under section 90.402, Florida Statutes. The trial court ruled that it would not allow the evidence to become a feature of the trial and cautioned the parties against any unnecessary or in-depth discussion.

Also at this hearing, the trial court heard motions made by the defense about Florida's capital sentencing scheme. Hunt had moved to declare multiple sections of Florida's capital sentencing scheme unconstitutional. In part, Hunt alleged that Florida's

---

intertwined with the crime charged . . . is admissible under section 90.402 . . . ." *Griffin v. State*, 639 So. 2d 966, 968 (Fla. 1994).

4. *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

scheme violated the Sixth and Eighth Amendments. The trial court denied the motions.

Before trial, the Governor signed into law Senate Bill 450 (SB 450), which amended Florida's death penalty statutes. Ch. 2023-23, Laws of Fla. (effective Apr. 20, 2023; codified at § 921.141, Fla. Stat. (2023)). SB 450 removed the requirement for a jury to be unanimous in recommending a death sentence. *See* ch. 2023-23, § 1, Laws of Fla. Under the new sentencing scheme, a jury must recommend a sentence of death to the court if at least eight jurors (i.e., a supermajority) determine a defendant should be sentenced to death. *Id.* If fewer than eight jurors make that determination, the jury's recommendation must be a life sentence. *Id.* Prior to trial, the State moved to utilize the amended version of the statute. Hunt objected, arguing that allowing a nonunanimous jury recommendation was both unconstitutional under *Hurst v. Florida,* 577 U.S. 92 (2016), and an ex post facto change of the law. Following a separate hearing, the trial court rejected those objections and granted the State's motion.

## C. Guilt Phase

The case proceeded to a four-day jury trial. The State presented the testimony of twenty-nine witnesses, while the defense presented one witness. The State's evidence at trial established the facts as explained above. The defense focused on (1) the undisputed fact that a second, unidentified man killed Lexie; (2) attacking Danny and Gabe's visual and voice identifications; and (3) highlighting the lack of forensic evidence.

Relevant to the issues on appeal, the defense objected several times to testimony about the sex crimes. Six of the State's twenty-nine witnesses testified about the sex crimes, some more briefly than others. During P.O.'s testimony, when the State asked her whether the prostitution took place in the shared hotel room in Biloxi, defense counsel objected, stating that this testimony was unnecessary to proving motive. The State responded that the purpose of P.O.'s testimony about Mississippi was to corroborate Gabe's testimony. The trial court stated that it would allow P.O. to answer the question but requested that the State then move on to the murder. Also, prior to Kaitlyn's testimony, defense counsel objected to any testimony by her that did not relate to the trip to

Atlanta and back. The trial court reiterated that her testimony about the sex crimes was relevant "for the limited purpose of [Hunt's] motive and to corroborate the testimony of [P.O.]"

At the preliminary charge conference, the State requested a transferred intent instruction for the first-degree murder charge. The defense objected, arguing that the facts did not support the instruction. The trial court ultimately approved the transferred intent instruction, and the jury convicted Hunt on all counts.

### D. Penalty Phase

The penalty phase began after trial with the same jury. The State presented victim impact evidence but otherwise relied on evidence from the trial. Defense counsel intended to call two expert witnesses as mitigating evidence, but Hunt requested that neither expert testify. Hunt's older sister, Wanda, who was his legal guardian during his teenage years, testified about his childhood and their "close knit" family. Hunt's father ran a nightclub and had eleven children with multiple women. Hunt did not interact much with his father; the only thing they enjoyed together was fishing. Wanda testified that the family tried to "make up for what [Hunt] lost" when his father died during his childhood. She also testified

that Hunt did well in school and was raised to know right from wrong. Wanda explained how after their father died, their mother worked during the day as a teacher and ran the nightclub at night, leaving one of Hunt's older sisters to run the household.

About five years after Hunt's father's death, the nightclub and the family's home were destroyed in fires on the same night. Three years after the fires, when Hunt was fourteen years old, his mother died of stomach cancer. At that time, Hunt went to live with Wanda and her husband. Wanda testified that her husband ran a recreation center and was a "strong force" in Hunt's life. Once he graduated high school, Hunt joined the United States Army, from which he eventually received a dishonorable discharge. After Hunt left the military, he pursued a career in rapping, and Wanda maintained infrequent contact with him. Hunt's niece testified about his community involvement and a rap that he performed on behalf of a recreation center.

The State sought to prove five aggravators.[5] The jury unanimously found that the State had proven all five aggravating

---

5. The five aggravators were (1) there was a contemporaneous conviction of attempted first-degree murder; (2) the murder was

- 14 -

factors beyond a reasonable doubt, considered the mitigating circumstances,[6] and weighed them with the aggravators. The jury then concluded by a vote of 10-2 that Hunt should be sentenced to death.

The trial judge followed the jury's recommendation and sentenced Hunt to death for his first-degree murder conviction. This direct appeal follows.

---

committed while engaged or an accomplice in the commission of a burglary; (3) the murder was committed to disrupt or hinder the lawful exercise of a governmental function or enforcement of laws; (4) the murder was especially heinous, atrocious, or cruel; and (5) the murder was committed in a cold, calculated, and premeditated manner with no pretense of moral or legal justification.

6. There was no mitigation presented based on the specific circumstances delineated in section 921.141(7)(a)-(g), Florida Statutes. Rather, Hunt's mitigation evidence was entirely premised on section 921.141(7)(h), which allows mitigation based on "[t]he existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty." § 921.141(7)(h), Fla. Stat. The trial court found the following factors in Hunt's background to be mitigation: (1) his family dynamic; (2) his childhood trauma; and (3) his mental health. The trial court afforded Hunt's childhood trauma some weight and his family dynamic and mental health little weight. In addition to the mitigation discussed in open court, the trial court's written order considered but afforded no weight to the following mitigating evidence: Hunt's childhood and adult achievements; his military career, including numerous commendations and other recognition; his physical health; his conduct while awaiting trial; and his potential for rehabilitation.

## II.

## A. Guilt Phase

On appeal, Hunt raises two issues related to the guilt phase of his trial.

## 1.

First, Hunt argues that the trial court erred in admitting evidence that P.O. and Kaitlyn were prostituted as "inextricably intertwined" with the charged acts. Hunt concedes that the evidence was relevant but argues that it exceeded the scope of what was necessary to provide an adequate description of the charged offenses. The nature of the evidence, he argues, ensured that it would be a feature of the trial. We review this claim for abuse of discretion. *Kirkman v. State*, 233 So. 3d 456, 467 (Fla. 2018) (citing *McGirth v. State*, 48 So. 3d 777, 786 (Fla. 2010)).

We have long held that evidence of "inextricably intertwined acts" is relevant and admissible at trial. *Griffin v. State*, 639 So. 2d 966, 968 (Fla. 1994). Collateral crimes evidence is "inextricably intertwined" if it is "necessary to (1) adequately describe the deed; (2) provide an intelligent account of the crime(s) charged; (3) establish the entire context out of which the charged crime(s) arose;

- 16 -

or (4) adequately describe the events leading up to the charged crime(s)." *Ballard v. State*, 66 So. 3d 912, 918 (Fla. 2011) (citing *Dorsett v. State*, 944 So. 2d 1207 (Fla. 3d DCA 2006)). Even when evidence is inextricably intertwined, it cannot become a feature of the trial. *Wright v. State*, 19 So. 3d 277, 293 (Fla. 2009) (citing *Morrow v. State*, 931 So. 2d 1021, 1022 (Fla. 3d DCA 2006)); *see also Bryan v. State*, 533 So. 2d 744, 746 (Fla. 1988). Relevant evidence of collateral crimes becomes a feature of the trial when it " 'transcend[s] the bounds of relevancy to the charge being tried' and the prosecution 'devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant.' " *Peterson v. State*, 2 So. 3d 146, 155 (Fla. 2009) (alternation in original) (quoting *Conde v. State*, 860 So. 2d 930, 945 (Fla. 2003)).

Our evaluation of whether the trial court abused its discretion is a case-specific one. *See Pitts v. State*, 263 So. 3d 834, 840-41 (Fla. 1st DCA 2019) (explaining that whether evidence becomes a feature of the trial is a fact-dependent determination, made on a case-by-case basis). In doing so, we have considered factors such as the number of references made to the evidence, whether the

- 17 -

evidence was a focus of the State's closing argument, and how the jury was instructed on the collateral crimes evidence. *Id.* (first citing *Wright*, 19 So. 3d at 293-94; and then citing *Peterson*, 2 So. 3d at 156).

Based on a complete review of the record, we find no abuse of discretion in the trial court's admission of evidence. The trial court was vigilant in ensuring that the collateral crimes evidence did not become a feature of the trial. Only six of the State's twenty-nine witnesses testified about the sex crimes. Most of those witnesses only mentioned the crimes as they related to the criminal investigation. P.O. and Kaitlyn both testified that they were prostituted but did not dwell on the topic. During closing argument, the State only briefly mentioned that P.O. "hid behind the door . . . because she was worried [that] she was going to be raped and killed by men that were there for her." The State did not mention the sexual battery or prostitution. Throughout trial, the trial court continuously limited the scope of the evidence to ensure that it only served its necessary purpose.

Overall, the record supports a conclusion that the State referenced the collateral crimes for the purposes of (1) establishing

that Hunt was criminally charged and there were pending arrest warrants when the murder took place and (2) establishing Hunt's identity, motive, intent, and premeditation to murder P.O., resulting in Lexie's death and the attempted murder of three others. *See Wright*, 19 So. 3d at 292 (concluding that the trial court did not abuse its discretion in admitting evidence of a separate burglary because it "(1) linked [the defendant] to one of the murder weapons and explained his possession of this weapon; (2) provided a geographical nexus for each event; and (3) established the context of [the defendant's] three-day crime spree"). Although the State mentioned these crimes during trial to establish the necessary context for the murders, the State was limited to introducing relevant evidence that did not transcend the bounds of the charges being tried. *See Cannon v. State*, 51 So. 3d 1261, 1262 (Fla. 1st DCA 2011) (holding that evidence of a collateral crime became a feature of the trial when it was discussed for approximately half of the opening and closing statements, two-thirds of the witnesses testified about it, and video of the crime was shown to the jury twice); *Ballard*, 66 So. 3d at 918 (explaining that collateral crimes evidence is "inextricably intertwined" and therefore relevant when it

establishes context for the charged crimes). P.O. and Kaitlyn's testimony, for instance, provided context for the jury to understand Hunt's motive for wanting to murder P.O. The sex crimes evidence here appropriately "paint[ed] an accurate picture of the events surrounding the crimes charged" and provided context for the criminal conduct. *Campbell v. State*, 271 So. 3d 914, 932 (Fla. 2018) (quoting *Truehill v. State*, 211 So. 3d 930, 945 (Fla. 2017)); *see also Foster v. State*, 679 So. 2d 747, 753 (Fla. 1996). Thus, we conclude that the trial court did not allow the evidence to become a feature of the trial and did not abuse its discretion in admitting the evidence.

**2.**

Next, Hunt argues that the trial court erred by instructing the jury on the doctrine of transferred intent. Hunt argues that the trial court erred because the doctrine of transferred intent typically applies when a defendant shoots at his intended target, but instead misses and kills someone else. Hunt posits that because his accomplice shot his intended target, but was mistaken about the identity of the victim, a transferred intent instruction does not apply. We review this issue for abuse of discretion. *Armstrong v.*

- 20 -

*State*, 73 So. 3d 155, 173 (Fla. 2011) (citing *Green v. State*, 907 So. 2d 489, 498 (Fla. 2005); Fla. R. Crim. P. 3.410).

We disagree with Hunt because his view of when a transferred intent instruction applies is too narrow.  To be sure, we have said that "[t]he usual case involving the doctrine of transferred intent is when a defendant aims and shoots at A intending to kill him but instead misses and kills B." *Provenzano v. State*, 497 So. 2d 1177, 1180 (Fla. 1986) (citing *Pressley v. State*, 395 So. 2d 1175, 1177 (Fla. 3d DCA 1981)).  But we have also noted that transferred intent is not limited to this specific factual scenario.  *Id.* at 1180-81; *see also Coston v. State*, 190 So. 520, 522 (Fla. 1939).  In addition, we have long held that the doctrine of transferred intent applies to cases where a person is killed through "mistaken identity or accident." *Lee v. State*, 141 So. 2d 257, 259 (Fla. 1962) (citing *Hall v. State*, 69 So. 692, 693 (Fla. 1915); *Pinder v. State*, 8 So. 837, 841 (Fla. 1891); *McCray v. State*, 102 So. 2d 831, 831 (Fla. 1925)).

Here, the evidence at trial showed that Hunt and his accomplice went to the house with the intent to kill P.O.  Although Hunt's "intricate design to effectuate death went awry" and P.O. survived, his accomplice still murdered Lexie.  *Provenzano*, 497 So.

- 21 -

2d at 1181. In fact, the State's evidence showed that Hunt's accomplice thought that he was shooting P.O. because of Lexie's red hair. *See id.* at 1180 (holding that even though Provenzano knew that he was shooting the bailiffs instead of his intended victims, transferred intent was still an appropriate instruction). Because the factual scenario here supports the doctrine of transferred intent, the trial court did not abuse its discretion in allowing the instruction. *Lee*, 141 So. 2d at 259; *see also Yates v. Evatt*, 500 U.S. 391, 409 (1991); *Coston*, 190 So. at 522 ("The law, as well as reason, prevents plaintiff in error from taking advantage of his own wrong doing, or excusing himself when this unlawful act, if committed by plaintiff in error, strikes down an unintended victim.").[7]

## B. Penalty Phase

Hunt next raises several constitutional claims related to the penalty phase and his death sentence, which are arguments we

---

[7]. We also reject Hunt's argument that the transferred intent instruction had the potential to confuse the jury about whose intent was transferred and how, because of the concurrent instruction on the law of principals and the fact that Hunt denied any involvement in the murder.

- 22 -

review de novo. *Jackson v. State*, 191 So. 3d 423, 426 (Fla. 2016) (citing *Crist v. Ervin*, 56 So. 3d 745, 747 (Fla. 2010)).

**1.**

First, Hunt argues that the trial court denied Hunt due process of law by failing to determine beyond a reasonable doubt that the aggravating factors were sufficient to justify the death penalty. Hunt acknowledges his argument is foreclosed by precedent. *See State v. Poole*, 297 So. 3d 487, 505 (Fla. 2020) (reiterating that our prior holding requiring the reasonable doubt standard "was based on a mistaken view"); *McKenzie v. State*, 333 So. 3d 1098, 1105 (Fla. 2022) (declining to revisit the issue); *Orme v. State*, 361 So. 3d 842, 845-46 (Fla. 2023) (same). Even so, he raises it now to preserve the issue for federal review. However, he does not offer a substantive reason for us to retreat from our precedent. We therefore decline to revisit this issue. *See Bevel v. State*, 376 So. 3d 587, 597 (Fla. 2023) (rejecting the same claim when it was raised solely to preserve for federal review); *Wells v. State*, 364 So. 3d 1005, 1014 (Fla. 2023) (rejecting this claim when the defendant provided "no substantial reason" for us to revisit our prior holdings).

**2.**

Next, Hunt asserts that Florida's capital sentencing scheme is constitutionally deficient for several reasons. We focus our analysis on just one of his arguments.[8] Specifically, Hunt argues that although we have previously determined that the Sixth Amendment does not require a unanimous jury to recommend a death sentence, *see Poole*, 297 So. 3d at 504, we should reevaluate our precedent in light of the United States Supreme Court holding in *Ramos v. Louisiana*, 590 U.S. 83 (2020). In *Ramos*, the Supreme Court held that the constitutional right to a jury requires a unanimous verdict as to all "essential elements" of a crime. *Id.* at 92.

---

8. Hunt makes two other arguments. First, he argues that by eliminating proportionality review, this Court has removed a necessary safeguard against arbitrary and inconsistent sentencing. Second, he argues that Florida has significantly expanded the number of offenses eligible for a death sentence since *Furman v. Georgia*, 408 U.S. 238 (1972), and the scheme no longer serves the constitutional mandate of narrowing the class of people subject to a death sentence. This Court has repeatedly considered and rejected these arguments. *See Loyd v. State*, 379 So. 3d 1080, 1097-98 (Fla. 2023) ("[W]e have 'repeatedly rejected the argument that the death-penalty statute violates the Eighth Amendment because it fails to sufficiently narrow the class of murderers eligible for the death penalty.' [*Wells*, 364 So. 3d at 1015.] Eliminating proportionality review did not change that analysis." (citing *Wells*, 364 So. 3d at 1015)). We do so again here.

We reject Hunt's argument. The holding in *Ramos* does not apply to a jury's recommendation of death in a capital case because a jury's recommendation is not equivalent to a verdict. *Poole*, 297 So. 3d at 504. Instead, it is a capital jury's finding of an aggravating factor that is equivalent to a verdict. *Id.* at 503. It is that finding that must be found by the jury. *McKinney v. Arizona*, 589 U.S. 139, 145 (2020). And as amended, Florida's capital sentencing scheme requires aggravating factors to be found by a unanimous jury. *See* § 921.141(2)(a)-(b), Fla. Stat.

As for Hunt's claim that eliminating the unanimous jury recommendation violates the Eighth Amendment, it also fails. For a capital sentencing scheme to pass constitutional muster, there must be an aggravating circumstance to narrow the class of persons eligible for the death penalty. *Zant v. Stephens*, 462 U.S. 862, 877 (1983). In imposing a death sentence, the trial court must be permitted to consider the defendant's individual circumstances, background, and crime. *Spaziano v. Florida*, 468 U.S. 447, 460 (1984) (citing *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978)). There must also be safeguards in place to ensure that there are no "wholly arbitrary, capricious, or freakish sentences." *Pulley v. Harris*, 465

U.S. 37, 45 (1984). We hold that Florida's capital sentencing scheme meets those requirements and does not violate the Eighth Amendment.[9]

Together, Florida's death penalty provisions[10] establish the constitutionally required safeguards to ensure that there are no

9. To the extent that Hunt contends that *Ramos* supports this argument, that case involved the Sixth Amendment right-to-a-jury-trial provision and did not invoke the Eighth Amendment. 590 U.S. at 88-89.

10. Unless the defendant has waived his or her right to such, there must be a full-length penalty phase hearing before a death sentence may be imposed. § 921.141(1), Fla. Stat.; *see also* Fla. R. Crim. P. 3.780. The jury must then deliberate and determine if the State has proven, beyond a reasonable doubt, the existence of an aggravating factor. § 921.141(2)(a), Fla. Stat. The jury must then "return findings identifying each aggravating factor found to exist." § 921.141(2)(b), Fla. Stat. "A finding that an aggravating factor exists must be unanimous." *Id.* For a defendant to be eligible for a sentence of death, the jury must unanimously find at least one aggravating factor. § 921.141(2)(b)1., Fla. Stat. If it makes such a finding, the jury must make a recommendation to the court as to whether the defendant should be sentenced to life imprisonment without the possibility of parole or to death. § 921.141(2)(b)2., Fla. Stat. In making that recommendation, the jury must weigh "[w]hether sufficient aggravating factors exist" and "[w]hether aggravating factors exist which outweigh the mitigating circumstances found to exist." § 921.141(2)(b)2.a.-b., Fla. Stat. Section 921.141 establishes the relevant aggravating factors and mitigating circumstances. § 921.141(6), (7), Fla. Stat.; *see also* Fla. R. Crim. P. 3.202. Based on those considerations, the jury recommends to the court "whether the defendant should be sentenced to life imprisonment without the possibility of parole or

"arbitrary, capricious, or freakish" death sentences. *See Pulley*, 465

U.S. at 45 (holding that a capital sentencing scheme with

"bifurcated proceedings, [a] limited number of capital crimes, [a]

requirement that at least one aggravating circumstance be present,

and the consideration of mitigating circumstances minimized the

risk of wholly arbitrary, capricious, or freakish sentences");

*Spaziano*, 468 U.S. at 466 (holding that Florida's capital sentencing

scheme, which contained many of the same provisions it still has

---

to death.  § 921.141(2)(b)2.c., Fla. Stat.  "If at least eight jurors determine that the defendant should be sentenced to death, the jury's recommendation to the court must be a sentence of death." § 921.141(2)(c), Fla. Stat.  And "[i]f fewer than eight jurors determine that the defendant should be sentenced to death, the jury's recommendation to the court must be a sentence of life imprisonment without the possibility of parole." *Id.*  If the jury opts for a life sentence, the court is bound by that recommendation and cannot impose death.  § 921.141(3)(a)1., Fla. Stat.  But if the jury recommends death, the court must consider "each aggravating factor found by the jury and all mitigating circumstances" and may then either impose a sentence of life imprisonment without the possibility of parole or a sentence of death.  § 921.141(3)(a)2., Fla. Stat.  The trial court "may consider only an aggravating factor that was unanimously found to exist by the jury." § 921.141(3)(a)2., Fla. Stat.  The trial court must also enter a written order in support of the imposed sentence.  § 921.141(4), Fla. Stat.  Finally, judgments of conviction and sentences of death are subject to automatic review by this Court.  § 921.141(5), Fla. Stat.; *see also* art. V, § 3(b)(1), Fla. Const.

today, did not violate the Eighth Amendment).  Thus, there is no support for the argument that the Eighth Amendment requires a unanimous jury recommendation.

**3.**

Finally, Hunt argues that application of section 921.141 as amended in 2023 violates the ex post facto clauses of the United States and Florida Constitutions because it increases the criminal punishment Hunt is exposed to by making it more likely the death penalty will be imposed.  For several reasons, we disagree.

Article I, section 10 of the United States Constitution prohibits a state from passing any ex post facto law.  Art. I, § 9, U.S. Const.[11]  To be ex post facto, a law must either alter the definition of criminal conduct or increase the criminal punishment.  *Victorino v. State*, 241 So. 3d 48, 50 (Fla. 2018) (citing *Lynce v. Mathis*, 519 U.S. 433, 441 (1997)); *see also Calder v. Bull*, 3 U.S. 386, 390 (1798) (defining

---

11.  The Florida Constitution also contains a prohibition on ex post facto laws.  Art. I, § 10, Fla. Const. ("No bill of attainder, ex post facto law or law impairing the obligation of contracts shall be passed.").  Although Hunt cites both provisions, he does not make a distinct argument related to the state constitution and instead primarily relies on federal precedent.

an ex post facto law).  Additionally, the statute in question must apply to events that occurred before its enactment and disadvantage the affected defendant.  *Collins v. Youngblood*, 497 U.S. 37, 41 (1990) (statutes must disadvantage the affected defendant (citing *Calder*, 3 U.S. at 390-92)); *Victorino*, 241 So. 3d at 50 (statute must be retrospective (citing *Lynce*, 519 U.S. at 441)).  Importantly, however, the Ex Post Facto Clause does not give the defendant the "right to be tried . . . by the law in force when the crime charged was committed."  *Dobbert v. Florida*, 432 U.S. 282, 293 (1977) (quoting *Gibson v. Mississippi*, 162 U.S. 565, 590 (1896)).

Hunt argues that the amended statute violates the ex post facto clauses because by decreasing unanimity requirements for penalty phase juries, the chance that the death penalty will be imposed increases.  The State, on the other hand, argues that the United States Supreme Court's decision in *Dobbert* demonstrates Hunt's argument is without merit.  We agree with the State.

In *Dobbert*, a defendant was convicted of murdering his two children and was sentenced to death.  *Id.* at 284-85, 287.  At the time of the murders, state law provided that a defendant convicted

of a capital felony was to receive a death sentence unless a majority of the jury recommended life. *Id.* at 288. Later that year, based on the United States Supreme Court's holding in *Furman v. Georgia,* 408 U.S. 238 (1972), the Florida Legislature amended its death penalty statute. *Dobbert,* 432 U.S. at 288-92. The changes included new requirements for a full penalty phase hearing, an advisory death recommendation by a majority of the jury, the weighing of aggravating and mitigating circumstances, and an automatic review by this Court. *Id.* at 290-92. Because his penalty phase occurred after these changes, Dobbert was sentenced to death under the parameters of the amended statute. *Id.* at 287.

Dobbert argued that sentencing him under Florida's amended statute violated the Ex Post Facto Clause. *Id.* at 292. But the Court concluded that these changes merely altered the methods used to determine the applicability of a death sentence rather than the "quantum of punishment" attached to the crime. *Id.* at 293-94. Therefore, the Court held, these changes were "clearly procedural" and did not violate the Ex Post Facto Clause. *Id.*

We agree with the State that *Dobbert* guides our analysis here. As Judge Nardella explained in *State v. Lobato*, 394 So. 3d 1219,

1224 (Fla. 6th DCA 2024), applying the United States Supreme Court's analytical framework in *Dobbert* to the amended statute compels the conclusion that the amended statute too contains merely procedural changes that do not alter the quantum of punishment. As a result, the statute does not violate Ex Post Facto Clause protections. *See id.*

Hunt argues that any procedure versus substance distinction that *Dobbert* established has since been undermined by the *Collins* decision, when the United States Supreme Court admonished that "by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause." *Collins*, 497 U.S. at 46 (citing *Gibson*, 162 U.S. at 590). Hunt further argues that as a result of *Collins*, the only remaining aspect of *Dobbert*'s rationale is that the statute at issue in *Dobbert* was not an ex post facto law because it was ameliorative.

However, as Judge Nardella also explained in *Lobato*, *Collins* does not undermine our conclusion. *See Lobato*, 394 So. 3d at 1224-25. *Collins* overruled portions of *Thompson v. Utah*, 170 U.S. 343 (1898). In *Thompson*, the defendant committed a capital crime when state law guaranteed him a jury of twelve people. *Id.* at 344.

By the time of his trial, the legislature had modified the law to only require a jury of eight people for conviction. *Id.* at 344-45. The Court held in *Thompson* that this change in law violated the Ex Post Facto Clause. *Id.* at 352-53. But the Court overruled that holding in *Collins*, reasoning that the right to a jury trial is based on the Sixth Amendment and has nothing "to do with the definition of crimes, defenses, or punishments, which is the concern of the *Ex Post Facto* Clause." 497 U.S. at 51. In other words, the Court held that even reducing the number of jurors needed to *convict* a defendant does not violate the Ex Post Facto Clause. *Id.* Thus, as Judge Nardella put it, "surely reducing the number of votes needed to provide a 'recommendation' of death also fails." *Lobato*, 394 So. 3d at 1225.

Finally, Hunt argues that even considering *Dobbert*, *Peugh v. United States*, 569 U.S. 530 (2013), which applied a risk analysis, should control our analysis. In *Peugh*, the United States Supreme Court explained that to determine whether there is an ex post facto violation, the relevant inquiry is "whether a given change in law presents a 'sufficient risk of increasing the measure of punishment attached to the covered crimes.'" 569 U.S. at 539 (quoting *Garner*

*v. Jones*, 529 U.S. 244, 250 (2000)); *see also Miller v. Florida*, 482 U.S. 423, 424-25 (1987) (addressing an ex post facto claim pertaining to sentencing guideline changes in Florida). The Court applied that test to a claim related to changes in federal sentencing guidelines and parole. *Peugh*, 569 U.S. at 533-34.

Hunt argues that eliminating the unanimity requirement makes it more likely that a death sentence will be imposed, thereby violating the Ex Post Facto Clause under *Peugh*. But we are again persuaded by the Sixth District Court of Appeal's reasoning on this issue. *See Lobato*, 394 So. 3d at 1225-26. The Sixth District explained that in *Peugh*, the "detrimental change in the guidelines virtually guarantee[d] an increase in the measure of punishment the defendant [would] face." *Id.* at 1226. The change to the statute here does not have a similar guarantee. *Id.* As the Sixth District explained, the legislature maintained the "essential framework" of the three-phase death penalty scheme in requiring a supermajority to offer a recommended sentence. *Id.* at 1227. It remains that a unanimous jury must find a statutory aggravating factor for a defendant to be eligible for the death penalty. *Id.* (citing *Poole*, 297 So. 3d at 503). Further, even if a jury recommends death, the trial

judge may opt for a life sentence. *See Miller*, 482 U.S. at 435 (finding an ex post facto violation where the judge did not have the discretion to opt for a more lenient sentence). These changes did not alter or increase the punishment. *Lobato*, 394 So. 3d at 1227 (citing *Peugh*, 569 U.S. at 530-31). The penalty remains death regardless of how many jurors are required to make the recommendation. *See id.* ("The two procedural changes . . . concern the question of mercy, which works only to abrogate, not to augment the punishment which can be imposed.").[12]

Overall, we apply the well-settled test and conclude that the recent changes to the death penalty scheme do not alter the definition of criminal conduct or increase the penalty by which the crime of first-degree murder is punishable. *Victorino*, 241 So. 3d at 50 (citing *Lynce*, 519 U.S. at 441). Thus, the statute does not constitute an ex post facto law.

---

12. Hunt also argues that this law violates ex post facto because unlike the statute in *Dobbert*, the change here was not "ameliorative." But the Supreme Court has been clear that a procedural change need not be "ameliorative" to not violate the Ex Post Facto Clause. *Dobbert*, 432 U.S. at 292 n.6 (citing *Beazell v. Ohio*, 269 U.S. 167 (1925)).

## III.

Finally, we turn to our independent obligation to review the sufficiency of the evidence. *See Colley v. State*, 310 So. 3d 2, 19 (Fla. 2020) ("[E]ven where the defendant does not challenge the sufficiency of the evidence, this Court has a mandatory obligation in death penalty cases to determine whether competent, substantial evidence supports a murder conviction." (citing *Kirkman*, 233 So. 3d at 469; Fla. R. App. P. 9.142(a)(5))). "In conducting this review, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Rodgers v. State*, 948 So. 2d 655, 674 (Fla. 2006) (citing *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)). Hunt was convicted based on theories of both premeditated and felony murder. His conviction can be upheld if the evidence is sufficient to support either theory. *Colley*, 310 So. 3d at 19 (citing *Rogers v. State*, 285 So. 3d 872, 891 (Fla. 2019)).

We conclude that competent, substantial evidence supports Hunt's first-degree murder conviction. The evidence at trial showed that Hunt was set to be arrested for the human trafficking and

sexual battery of P.O. Upon learning of his pending arrest warrant at a separate court hearing, Hunt defied the trial judge's instruction to remain at the courthouse and fled to another state with Kaitlyn. Tracking on Hunt's primary cellphone, as well as license plate readers, confirmed this trip. There, he formed the premeditated intent and plan to kill P.O. He borrowed an unrecognizable vehicle and tinted the vehicle's windows. He purchased two nontraceable phones, black sweatpants, and a black hoodie. During the trip, Hunt told Kaitlyn about the criminal charges against him and that he would "do what he had to do" and "no witness, no case." Once Hunt made his preparations, he returned to Panama City, where he was observed in the vehicle on business security camera recordings near the victim's home immediately before the murder.

Hunt then forcibly entered the victim's home, using a pizza delivery ruse, with an accomplice. Danny, the victim's stepfather, identified Hunt visually and through his "very distinctive" voice. After he was shot, Danny informed both police and his neighbor that Hunt was the perpetrator. Gabe, who was hiding during the murder, also identified Hunt's voice. Although there was no DNA or latent fingerprint evidence linking Hunt to the scene, a spent casing

from a .380 caliber pistol was recovered from the home's living room. Hunt owned this type of weapon. A .380 caliber semi-automatic was later found in a neighbor's bushes, and the recovered casing was matched to that weapon. When law enforcement apprehended Hunt, he was driving the vehicle and wearing the same black sweatshirt purchased with Kaitlyn and observed on the night of the murder. He also attempted to disguise his identity by wearing a woman's wig.

Viewed in the light most favorable to the State, there is competent, substantial evidence to support Hunt's first-degree murder conviction.

## IV.

We affirm Hunt's first-degree murder conviction and death sentence, as well as his convictions for attempted murder and armed burglary of a dwelling.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

Today's decisions in *Hunt v. State*, No. SC2024-0096 (Fla. Dec. 18, 2025), and *Jackson v. State*, No. SC2023-1298 (Fla. Dec. 18, 2025), reject various challenges to the 2023 statutory amendment that requires only eight members of a twelve-person capital jury to vote to recommend the death penalty. I concur in the result to the extent that these decisions are consistent with what this Court has held since *State v. Poole*, 297 So. 3d 487 (Fla. 2020).

However, as I explain in my concurring in result opinion in *Jackson*, the statutory amendment requiring only an 8-4 jury vote to recommend that a defendant be sentenced to death renders Florida's requirement the least demanding nationally and establishes Florida as the state with the least rigorous requirement among states that impose the death penalty.

I believe that the use of the death penalty in Florida and the integrity of the process benefit from safeguards such as the requirement of jury unanimity, and I believe that such safeguards are constitutionally permissible. I also continue to adhere to the views expressed in my dissent in *Lawrence v. State*, 308 So. 3d 544

(Fla. 2020) (receding from the decades-long practice of conducting proportionality review in direct appeals of sentences of death).

For these reasons, I can only concur in the result.

An Appeal from the Circuit Court in and for Bay County,
    Shonna Young Gay, Judge
    Case No. 032019CF002281XXAXMX

Jessica J. Yeary, Public Defender, and Barbara J. Busharis, Assistant Public Defender, Second Judicial Circuit of Florida, Tallahassee, Florida,

    for Appellant

James Uthmeier, Attorney General, Charmaine M. Millsaps, Senior Assistant Attorney General, and Benjamin L. Hoffman, Senior Assistant Attorney General, Tallahassee, Florida,

    for Appellee